**Nicholas DE PACE, Salvatore Di Blasi, and Andrew G. Molinaro, Plaintiffs,**

v.

**MATSUSHITA ELECTRIC CORPORATION OF AMERICA, Defendant.**

No. 02–CV–4312(ERK).

United States District Court, E.D. New York.

May 15, 2003.

Harvey W. Spizz, Spizz & Cooper, LLP, Mineola, NY, for Plaintiffs.

David W. Garland, Daniel Turinsky, Sills, Cummis, Radin, Tischman, Epstein & Gross, New York, NY, for Defendant.

### MEMORANDUM & ORDER

KORMAN, Chief Judge.

Plaintiffs Nicholas DePace, Salvatore Di Blasi and Andrew Molinaro brought this ERISA action against Matsushita Electric Corporation ("Matsushita"), the parent company of their former employer Pana-

sonic, alleging that the company fraudulently induced them to participate in a voluntary resignation program by furnishing them with misleading information as to the pension benefits they could expect. Matsushita moves to dismiss the complaint pursuant to rule 12(b)(6).

## BACKGROUND

### 1. Allegations in the Complaint as to Plaintiff DePace

The complaint alleges that on October 12, 2001, plaintiff Nicholas DePace received materials advising him of his eligibility to participate in Matsushita's Voluntary Resignation Program (the "VRP"). (Cmplt. ¶ 9). This program provides employees with special severance payments including lump sum cash payments based upon years of service and enhanced medical benefits, in exchange for the execution of a release of claims against Matsushita. The materials sent to DePace included a Summary Plan Description of the VRP (Exhibit 2)[1], an Election and Release Form (Exhibit 3), Personalized Separation Pay Information (Exhibit 1), and a Checklist (Exhibit 4).

According to the Summary Plan Description, participation in the VRP was "STRICTLY VOLUNTARY" and eligible employees who elected to participate were required to inform Matsushita by December 3, 2001. (Exhibit 2, at 2). The Summary Plan Description also informed Mr. DePace that by electing to participate in the VRP he would receive a lump sum separation payment on December 31, 2001 equal to 2.6 weeks of base pay for each year of service earned through October 12, 2001, up to a maximum of 52 weeks. (Id. at 3). The Summary Plan Description also explained that participating employees would have their monthly premium payments for COBRA paid by the Company for up to 18 months or, as an alternative for employees age 55 years or older with 10 years of service, special rates for their continued medical coverage under a Post Employment Medical Option. (Id. at 4–5).

As a component of the VRP, Matsushita provided an administrative process to be utilized by employees who did not receive benefits to which they believed they were entitled. The Summary Plan described this process in great detail:

### Review of Denial of Benefits

In the event that an employee does not receive benefits to which he/she thinks he/she is entitled, such individual may file a written claim for those benefits. The written claim should specify the amount of the claim and any other pertinent data and should be submitted to the Plan Administrator. In the event that such individual's claim is denied, in whole or in part, he/she will be notified in writing. The notice will tell the individual why his/her claim was denied, and either request any additional information necessary to grant such claim or tell the individual what to do to appeal the denial. To appeal, the employee must inform the Company (Attn: Plan Ad-

---

1. References to exhibits refer to the exhibits attached to the Certification of David W. Garland, dated September 13, 2002, accompanying defendant's motion to dismiss. Because these documents are referenced in the complaint and because plaintiffs' claims are premised on what is contained in them, they may be considered in deciding this motion to dismiss. *See Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999); *Int'l Audiotext Network, Inc. v. AT & T*, 62 F.3d 69, 72 (2d Cir.1995); *Hogan v. Eastern Enterprises/Boston Gas*, 165 F.Supp.2d 55, 58 (D.Mass.2001) (holding that pension plan documents and signed releases may be considered on a motion to dismiss because they were referenced in the complaint and integral to plaintiff's claim of fraudulent inducement).

ministrator) in writing, setting forth the facts and benefits claimed within sixty (60) days of such denial. On appeal, the employee has the right to review pertinent Plan documents and send to the Plan Administrator a written statement of the issues and any other documents in support of the claims for benefits or other matters under review. The Plan Administrator will render a decision with respect to the individual's claim within sixty (60) days of receipt of his/her appeal. When special circumstances require more time for a decision, the employee will be notified by the Plan Administrator in writing prior to the end of this sixty (60) day period of the potential delay and the reasons for the delay. In such a case, an additional sixty (60) days for a total of one-hundred and twenty (120) days may be taken to render a decision. In any event, the employee will receive the Plan Administrator's written response within sixty (60) or one-hundred and twenty (120) days of receipt of the appeal. The response will include the specific reasons for the decisions as well as references to the pertinent Plan provisions on which the decision is based. If the Plan Administrator does not give its decision on review within the appropriate time span, the employee may consider the claim denied. *Please note that the Plan requires that a participant pursue all the claims and appeal rights described above before seeking any other legal recourse regarding claims for benefits.*

(*Id.* at 6)(emphasis in original).

Panasonic, the division of Matsushita Corp. in which Mr. DePace was employed, also sent detailed pension plan materials to Mr. DePace describing the benefits employees would be entitled to if they elected to participate in Matsushita's VRP. (Exhibit 5). The Panasonic Pension Plan contained a similar description of the administrative process for resolving employee benefit disputes:

**CLAIMS PROCEDURE**

If you don't receive benefits to which you feel you're entitled, you may file a written claim with the Plan Administrator.

*If Your Claim is Denied*

If your claim for benefits is denied, in whole or in part, you'll receive a written explanation within 90 days after receipt of your claim. In the event of special circumstances, the Plan Administrator may extend the period for a determination for up to an additional 90 days, in which case you will be so advised. This explanation will cover specific reasons for the denial of your claim, the specific references in the Plan Documents that support those reasons, the information you must provide to verify your claim and the reasons why that information is necessary, and the procedure available for further review of your claim.

If you don't receive a written report of your claim within 90 days, you should assume your claim has been denied.

*Your Rights to Appeal*

You have the right to appeal a denial. You must submit a written appeal to the Plan Administrator within 60 days after you receive the claim denial notice. You and your representative may review the Plan documents pertinent to your claim and submit written comments and relevant information.

\* \* \*

The Plan Administrator or Plan Administrative Committee will conduct a full and fair review of your appeal, and will notify you of the decision within 60 days. Due to special circumstances, the Plan Administrator may extend the period for determination for up to an additional 60

days. The decision will be in writing, and will include the specific reasons and the Plan references on which the decision is based.

Any failure on your part to comply with the request for information by the Plan Administrator or the Committee constitutes sufficient grounds for delay in the payment of benefits and until such information is received.

(Exhibit 5 at 38–39).

According to the complaint, Mr. DePace received four pension benefit estimates during the months of October 2001: one dated October 18, 2001 (Exhibit 6); two dated October 19, 2001 (Exhibits 7–8); and one dated October 26, 2001 (Exhibit 9). Each pension estimate clearly stated that "[w]hile every effort has been made to provide accurate figures, this statement is subject to correction for any errors in data accumulation or benefit calculations." (Exhibits 6–9). All four estimates also contained the following disclaimer: "The availability and amount of all benefits is governed by the plan documents and not by this statement." (*Id.*). The complaint alleges that these estimates "included contributions that had been made toward De-Pace's pension during the years he had worked at Panafax, a company which later merged with Panasonic, a division of MECA [Matsushita Electric Corporation of America]." (Cmplt.¶ 11). Indeed, all four pension estimates use the date March 30, 1987, the date on which Mr. DePace commenced employment at Panafax, for purposes of computing "Pension Service." As alleged in the complaint, the pension estimate dated October 18, 2001 provided that Mr. DePace would receive a lump sum payment of $349,219.42. (*Id.* at ¶ 12).

The complaint further alleges that on November 5, 2001, Mr. DePace signed and submitted a Voluntary Resignation Package. (Cmplt.¶ 13). Included in that pack-age was an Election and Release Letter signed by Mr. DePace, which provided for a release of all claims against Matsushita including: "[c]laims, actions, causes of action or liabilities arising under ... the Employee Retirement Income Security Act of 1974, as amended ..." (Exhibit 10). The Election and Release Letter advised Mr. DePace that he had forty-five days to consider participating in the VRP and another seven days to revoke his decision to participate. It also encouraged Mr. De-Pace "to consult with your personal attorney" before signing the Release. (*Id.*). On the final page of the Election and Release Letter, just above the signature line where Mr. DePace signed to indicate his interest in participating in the VRP, the following language appeared in bold print:

**By signing this Agreement, you acknowledge that: (i) you have read this Agreement completely; (ii) you have had an opportunity to consider the terms of this Agreement; (iii) you have had the opportunity to consult with an attorney of your choosing prior to executing this Agreement to explain the Agreement and its consequences; (iv) you know that you are giving up important legal rights by signing this Agreement; (v) you understand and mean everything that you have said in this Agreement, and you agree to all its terms; and (vi) you have signed this Agreement voluntarily and entirely of your own free will.**

(*Id.* at 5).

The complaint alleges that on or about December 10, 2001, Mr. DePace "heard that MECA was indicating to a similarly-situated co-worker that people taking early retirement would not receive pension credit for years at Panafax." (Cmplt.¶ 14). According to the complaint, Mr. DePace

inquired about this issue but received no response from Matsushita other than being told "that the issue was being investigated." (*Id.* at ¶¶ 15–16). Mr. DePace left employment with Matsushita on December 28, 2001, and alleges that on January 22, 2002, he was informed that his actual pension benefit would be $308,030.70, rather than the $349,219.42 indicated in the October 18, 2001 estimate. (*Id.* at ¶¶ 17–18). This represents a shortfall of $41,188.72 and a reduction of 12% of the anticipated pension benefit.

Mr. DePace received $75,006.00 (less applicable deductions) in separation payments pursuant to the VRP, along with enhanced medical benefits, in exchange for voluntarily executing the Election and General Release. (Exhibit 1). He has not tendered back this consideration.

### 2. Allegations in the Complaint as to Plaintiff Di Blasi

According to the complaint, on October 12, 2001 Mr. Di Blasi was also "offered voluntary retirement" (Cmplt.¶ 19), and received written materials advising him of his eligibility to participate in the VRP, including many of the same materials provided to Mr. DePace: a Summary Plan Description (Exhibit 2); an Election and Release Letter (Exhibit 3); and an Employee Checklist (Exhibit 4).

The complaint alleges that Mr. Di Blasi received an estimate, dated October 18, 2001, which informed him of the benefits he would receive if he chose to participate in the VRP on January 1, 2002. (Cmplt.¶ 20). The estimate indicated that Mr. Di Blasi would be entitled to a lump sum separation payment of $360,402.89. (Exhibit 12). In calculating this benefit, Mr. Di Blasi's years of service were based on November 17, 1977, the date on which he commenced employment with Panafax. (*Id.*). As with the estimates provided to

Mr. DePace, the estimate sent to Mr. Di Blasi indicated that it was "For Illustration Purposes Only," and stated that "[w]hile every effort has been made to provide accurate figures, this statement is subject to correction for any errors in data accumulation or benefit calculations." (*Id.*). In addition, the estimate contained the identical disclaimer that "[t]he availability and amount of all benefits is governed by the plan documents and not by this statement." (*Id.*).

On October 27, 2001, Mr. Di Blasi signed and submitted a Voluntary Resignation Package, effective December 28, 2001. (Cmplt.¶ 21). Included in that package was the Election and Release Letter signed by Mr. Di Blasi on the same date. The letter contained a release of all claims against Matsushita, including "[c]laims, actions, causes of action or liabilities arising under ... the Employment Retirement Income Securities Act of 1974, as amended ..." (Exhibit 13). The Election and Release Letter signed by Mr. Di Blasi indicated that he had forty-five days to indicate his desire to participate in the VRP, after which he would be afforded a seven-day revocation period. (*Id.*). Mr. Di Blasi's Election and Release Letter contained the same bold print language just above the signature line, which specified that he had read the agreement, that he had the opportunity to review it with an attorney of his choosing, that he understood it, and that he agreed to its terms. (*Id.*).

As alleged in the complaint, Mr. Di Blasi was informed on December 7, 2001, prior to his last date of employment, that his actual pension benefit would be $229,387.01, rather than $360,402.89, as had been indicated in the October 18, 2001 estimate. (Cmplt.¶ 22). This represented a shortfall of $131,015.88, and a reduction of 36% of his anticipated pension benefit. Mr. Di Blasi could not rescind his resigna-

tion at this time, as the seven-day window period had already expired. (See SPD Exhibit 2 at p. 3).

Mr. Di Blasi has received $123,692.45 (less applicable deductions) in separation payments pursuant to the VRP, along with enhanced medical benefits, in exchange for voluntarily executing the Election and General Release. (Exhibit 11). He has not tendered back this consideration.

### 3. Allegations in the Complaint as to Plaintiff Molinaro

The complaint alleges that on October 17, 2001, Mr. Molinaro received the same Voluntary Resignation Package as DePace and Di Blasi. (Cmplt.¶ 25). Mr. Molinaro also received two pension estimates, dated October 30, and 31, 2001. (Cmplt.¶ 26). Mr. Molinaro's separation payment in these estimates was calculated based on a commencement date of October 24, 1977, the day on which he began employment with Panafax. (Exhibits 15–16). As with the estimates to Mr. DePace and Mr. Di Blasi, Mr. Molinaro's estimates both stated that they were "For Illustration Purposes Only" and provided that "[w]hile every effort has been made to provide accurate figures, this statement is subject to correction for any errors in data accumulation or benefit calculations." (Exhibits 15–16). In addition, the estimates stated that "[t]he availability and amount of all benefits is governed by the Plan documents and not by this statement." (Id.).

According to the complaint, Mr. Molinaro submitted his signed Voluntary Resignation Package on November 2, 2001. (Cmplt.¶ 28). Contained in that package was the Election and Release Letter executed by Mr. Molinaro, which released Matsushita from all claims including "[c]laims, actions, causes of action or liabilities arising under ... the Employment Retirement Security Act of 1974, as amended ..." (Exhibit 17). The Election and Release Letter informed Mr. Molinaro of the forty-five day window and seven day revocation period. (Id.). It also contained the same bold print language found in DePace's and Di Blasi's Election and Release Letters, stating that Mr. Molinaro had read the agreement, had the opportunity to review it with counsel, understood it, and agreed to its terms. (Id.).

As alleged in the complaint, on December 17, 2001, prior to leaving Matsushita, Mr. Molinaro sent an e-mail inquiry to Michael Miller, General Manager of Personnel for Matsushita, "indicating that he heard of a possible discrepancy with the pension estimates" and requesting an explanation. (Cmplt.¶ 29). The complaint avers that Mr. Molinaro was told that Mr. Miller "was looking into the matter," but that Mr. Molinaro did not receive any further response. (Id. at ¶¶ 30–31).

Mr. Molinaro's employment with Matsushita ended on December 31, 2001, pursuant to his participation in the VRP. (Id. at ¶ 32). Approximately three weeks later, Mr. Molinaro received a letter from Mr. Miller indicating that his prior years of service at Panafax "did not count for pension credit purposes." This was the first official notification Mr. Molinaro received that there might be a problem with his estimated benefits. (Id. at ¶ 33). Mr. Miller's letter was also addressed to Mr. DePace and Mr. Di Blasi, and explained why their prior years of service at Panafax were not included in the calculation of their pension benefits:

In reviewing the records, it was very clear that the Panafax benefits ended on March 31, 1989 and MECA benefits started on April 1, 1989. There were of course payouts to you for the full value of the Panafax pension program at that time. The Panafax pension and the MECA pension are two separate legal

documents and legally can not be "mixed" together. This means a benefit from one doesn't carry over to the new program unless there is a legal description.

All of you strongly felt that your Panafax service time was to be considered part of the MECA Pension Program. There is nothing in any document that would indicate that in any form. Again, one program ended completely and the new one started without any language related to the previous program.

There probably was a discussion at the meeting about "vesting credit". The MECA pension program allows people who were transferring from Panafax to MECA who have 5 or more years of service to be 100% vested in the MECA pension. Normally, there is a 5 year vesting period for an individual to become eligible for such a program. MECA counted your years of service for vesting only. On April 1, 1989, you may have been vested in the MECA pension but you had "0" years of service.

(Letter from Mr. Miller to Mr. Molinaro, Mr. DePace, and Mr. Di Blasi, dated January 22, 2002. Attached as Exhibit 18).

On March 1, 2002, Mr. Molinaro received a letter from Matsushita Assistant Manager Susan McElroy indicating that his pension benefit would be $226,668.79. (Exhibit 19). This was $125,999.68 less than had been indicated in the earlier estimate, and a reduction of 36% of the anticipated pension benefit. (Cmplt.¶¶ 34–36).

Mr. Molinaro has received $120,917.45 (less applicable deductions) in separation payments pursuant to the VRP, along with enhanced medical benefits, in exchange for voluntarily executing the General Release. (Exhibit 14). He has not tendered back this consideration.

### 4. *Liability and Damages*

Plaintiffs' claims for damages rest on the following: (1) Matsushita "knew or reasonably should have known that the representations made to the plaintiffs concerning the amount of their benefits upon retirement were false"; (2) the representations were intentionally or recklessly made by Matsushita "to induce plaintiffs to resign"; (3) plaintiffs "reasonably relied upon [Matsushita's] representations . . . and resigned from the employment of [Matsushita]"; and (4) as a result of their resignations, plaintiffs were damaged. (Cmplt.¶¶ 38, 40, 43, 44).

Plaintiffs' seek "compensatory damages" in the amount of their claimed shortfalls ($41,188.72 for Mr. DePace; $131,015.60 for Mr. Di Blasi; $125,999.18 for Mr. Molinaro), "together with sufficient additional damages to compensate for the tax disadvantage of not receiving these funds as a pension payment and interest," front pay and benefits, punitive damages of $1,000,000, attorneys' fees and costs, and "[s]uch other and further relief as may be just and proper." (Cmplt.¶ 46). All of these requests for relief are premised on 29 U.S.C. § 1132(a)(3). (Cmplt.¶ 1).

### DISCUSSION

Defendant Matsushita moves to dismiss the complaint pursuant to Rule 12(b)(6) on the following grounds: (1) the complaint fails to state a claim for equitable estoppel because there could be no reasonable reliance on "estimates" of benefits and because plaintiffs do not adequately plead "extraordinary circumstances"; (2) releases voluntarily executed by plaintiffs bar their ERISA claims; (3) plaintiffs' ERISA claims are premature since they have not exhausted their administrative remedies; (4) plaintiffs cannot recover compensatory and punitive damages under 29 U.S.C. § 1132(a)(3); and (5) plaintiffs' jury de-

mand must be stricken because jury trials are not available in ERISA actions. Plaintiffs move to amend the complaint to include a common law fraud claim.

### 1. The Complaint States a Valid Claim for Equitable Estoppel

 Principles of estoppel can apply in ERISA cases under "extraordinary circumstances." *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 78 (2d Cir. 1996). To succeed on a claim of promissory estoppel, a plaintiff must satisfy four elements: (1) a promise; (2) reliance on the promise; (3) injury caused by the reliance; and (4) an injustice if the promise is not enforced. *Aramony v. United Way Replacement Benefit Plan*, 191 F.3d 140, 151 (2d Cir.1999). In addition, "an ERISA plaintiff must 'adduce [ ] not only facts sufficient to support the four basic elements of promissory estoppel, but facts sufficient to [satisfy an] 'extraordinary circumstances' requirement as well.'" *Id.* (quoting *Devlin v. Transp. Comms. Int'l Union*, 173 F.3d 94, 102 (2d Cir.1999)). As the Second Circuit explained in *Aramony*, these "extraordinary circumstances" are necessary "to lessen the danger that commonplace communications will routinely be claimed to give rise to employees' rights beyond those contained in the formal benefit plans." *Id.*

 Matsushita argues that the complaint fails to state a claim for promissory estoppel because plaintiffs could not reasonably rely on "estimates" of benefits that specifically disclaimed any binding effect. Each statement that allegedly gave rise to plaintiffs' detrimental reliance denoted that it was an "ESTIMATE" and "For Illustration Purposes Only." (Exhibits 6–9, 12, 15–16). The statements also warned that "[w]hile every effort has been made to provide accurate figures, this statement is subject to correction for any errors in data accumulation or benefit calculations." (*Id.*). Moreover, the estimates each made clear that the "availability and amount of all benefits is governed by the plan documents and not by this statement." (*Id.*). Pointing to the definition of "estimate" in Webster's Dictionary, Matsushita argues that by their very nature, the estimates provided to plaintiffs could not be relied on.

However, the issue is more complex than a simple dictionary definition of the term "estimate." All of the statements provided to plaintiffs specifically noted the date of commencement of employment that would be used for calculating pension benefits. In every single one of these statements, the date indicated was the exact date each plaintiff began working for **Panafax**. There is no indication that plaintiffs received any subsequent statements explaining that the dates used were erroneous. Nor did they receive any corrected estimates indicating what their actual benefits would be until after the window period for rescinding their participation had already lapsed. While plaintiffs may reasonably have expected that the actual monetary calculations would diverge slightly from the estimates, there was nothing that might indicate to plaintiffs that the entire basis for calculating their benefits would change. Most importantly, the plan documents are ambiguous on this issue. Neither the summary plan description nor any of the additional materials sent to the plaintiffs clearly define "years of service" or the accrual of benefits with respect to successor companies. Certainly these documents do not contain any information that would put employees on notice that, contrary to the written estimates they received, their benefits would not include service accumulated at a successor company that was acquired by Matsushita. In the absence of any clear documented infor-

mation to rely on, I cannot conclude that plaintiffs' reliance on the statements sent by Matsushita was unreasonable as a matter of law. This is especially true if it is assumed, as it must be on a motion to dismiss, that the allegations of intentional misrepresentations in the complaint are true.

Matsushita also argues that plaintiffs have not shown the "extraordinary circumstances" required for equitable estoppel under ERISA. This contention is without merit. The Second Circuit has specifically held that an employer's use of promised severance benefits to induce a plaintiff to retire constitutes an extraordinary circumstance. *See Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 86 (2d Cir. 2001) (citing *Schonholz v. Long Island Jewish Med. Center*, 87 F.3d 72, 79–80 (2d Cir.1996)). To satisfy this requirement, plaintiffs need only demonstrate "a promise that [Matsushita] reasonably should have expected to induce action or forbearance on [their] part." *Id.* (quoting *Schonholz*, 87 F.3d at 79–80). As indicated above, Matsushita sent statements to the plaintiffs which gave the clear impression that their benefit calculations would include years of service accrued while employed by Panafax. Since Matsushita did not clarify this "mistake" or distribute to plaintiffs any materials purporting to explain the calculation of years of service, the company should have expected plaintiffs to rely on its statements. As alleged in the complaint, Matsushita even delayed its response to plaintiffs' inquiries on the issue until after their ability to withdraw participation in the VRP was lost. Taken as a whole, the allegations in the complaint sufficiently state a claim for fraudulent inducement such that the "extraordinary circumstances" requirement is met.

The cases Matsushita relies on are inapposite. *Manning v. Niagara Mohawk Power Corp.*, 1997 WL 216214 (N.D.N.Y. 1997), was decided before the Second Circuit's decision in *Schonholz*, and its weight is therefore suspect. *Berg v. Empire Blue Cross and Blue Shield*, 105 F.Supp.2d 121, 130 (E.D.N.Y.2000), specifically held that "[t]here is nothing in the complaint to suggest, for example, that [the defendant] made such a promise to induce Plaintiff to not obtain other life insurance." In contrast, the complaint here explicitly alleges that Matsushita intentionally or recklessly mislead plaintiffs for the purpose of inducing them to retire early. This allegation is supported by the absence of any documentation indicating how years of service were to be calculated, and the complete lack of any correction to the grossly exaggerated pension estimates until after plaintiffs could no longer withdraw their participation. Finally, in *Fitch v. Chase Manhattan Bank, N.A.*, 64 F.Supp.2d 212, 226–27 (W.D.N.Y.1999), Judge Siragusa's attempt to distinguish *Schonholz* clearly shows how different it is from the present case:

> In *Schonholz*, the employee was induced to resign based upon the representation that she would be paid certain severance benefits, but after she actually resigned, the employer reneged. Here, the instant record does not support a finding that the defendants acted intentionally. Moreover, the defendants did not use a misrepresentation to actually induce the plaintiffs to retire, but rather, they notified the plaintiffs of the error and gave them an opportunity to return to the status quo ante.

The facts in this case are kindred to *Schonholz*, not *Fitch*, as the plaintiffs were never offered the opportunity to rescind their retirement decisions. Indeed, they were not even notified about the radical change in their potential benefits until after it was too late for them to return to the *status quo ante*.

Taken as a whole, the allegations in the complaint sufficiently state a claim for fraudulent inducement such that the "extraordinary circumstances" requirement is met.

### 2. The Releases Signed by Plaintiffs Do Not Bar This Action

■ In order to participate in Matsushita's Voluntary Resignation Program, plaintiffs were required to sign an Election and General Release form (the "General Release"), which purported to release Matsushita from all liability, including "[c]laims, actions, causes of action or liabilities arising under ... the Employment Retirement Security Act of 1974, as amended ..." (Exhibit 13). Although Matsushita argues that the releases were knowingly and voluntarily executed by plaintiffs, the allegations of fraudulent inducement in the complaint preclude enforcement of the releases at this stage of the proceeding.

■ In *Lockheed Corp. v. Spink,* 517 U.S. 882, 894, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), the Supreme Court sanctioned the use of "early retirement incentives conditioned upon the release of claims" and found that conditioning additional benefits on the voluntary waiver of claims against an employer was not prohibited by section 406(a)(1)(D) of ERISA. The Court explained that "if an employer can avoid litigation that might result from laying off an employee by enticing him to retire early, ... its stands to reason that the employer can also protect itself from suits arising out of that retirement by asking the employee to release any employment-related claims he may have." *Id.* at 894–95, 116 S.Ct. 1783. However, "[t]he validity of a waiver of pension benefits under ERISA is subject to closer scrutiny than a waiver of general contract claims." *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 231 (2d Cir.1995). A release in exchange for early retirement benefits is effective only if, in the totality of the circumstances, the employee's waiver of rights was "knowing and voluntary." *Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan,* 935 F.2d 1360, 1367 (2d Cir.1991).

■ When determining whether a waiver of ERISA claims was made knowingly and voluntarily, consideration must be given to the following factors: (1) the plaintiff's education and business experience; (2) the amount of time the plaintiff had possession of or access to the agreement before signing it; (3) the role of the plaintiff in deciding the terms of the agreement; (4) the clarity of the agreement; (5) whether the plaintiff was represented by or consulted with an attorney (and whether the employer encouraged the employee to consult with an attorney and gave him/her a fair opportunity to do so); and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law. *Laniok,* 935 F.2d at 1368.

Matsushita argues that district courts have consistently enforced releases analogous to the General Release signed by plaintiffs in this case. In *Yablon v. Stroock & Stroock & Lavan Retirement Plan & Trust,* 2002 WL 1300256 (S.D.N.Y. June 11, 2002), for example, Judge Motley granted the defendant's motion to dismiss the plaintiff's ERISA claims because the plaintiff had signed a separation agreement releasing the employer from all employment related claims. In finding that the employer's waiver of rights was knowing and voluntary, she noted that the plaintiff had 45 days to consider the terms of the release and review it with counsel, and an eight-day window period in which he could revoke the release after its execution. *Id.* at *5. Judge Motley also pointed to provisions in the agreement that encouraged the plaintiff to consult an attor-

ney, and the final paragraph of the release which indicated that by signing the release the employee was acknowledging that he had read the agreement in its entirety and understood that it constituted a complete waiver and general release of all claims. *Id.* at *6.

Similarly, in *Hogan v. Eastern Enterprises/Boston Gas*, 165 F.Supp.2d 55 (D.Mass.2001), Magistrate Judge Collins dismissed an equitable estoppel claim under ERISA because the plaintiff accepted enhanced retirement benefits in exchange for a release of claims. In discussing why the *Laniok* factors favored a finding of voluntariness, the court noted that the plaintiff had 45 days to consider the retirement plan, and another 7 days within which to rescind his election to participate. *Id.* at 62. In addition, the release contained language advising plaintiff to seek counsel and stating that by signing the agreement plaintiff acknowledged that he had fully read the release and voluntarily assented to its terms and conditions. *Id.* Judge Collins also found that although the release was drafted by the employer, there was no allegation that the terms were inequitable or that the language was unclear. Finally, as in *Yablon*, there was no dispute that the plaintiff received additional retirement benefits in exchange for signing the release. *Id.*

The *Laniok* factors greatly favor Matsushita's position in this case. Similar to those in *Yablon* and *Hogan*, Matsushita's separation agreement encouraged employees to seek legal counsel, gave a minimum of forty-five days to consider the terms of the agreement, and provided for a seven-day window within which employees could rescind their election to participate. (Exhibit 10). It is undisputed that plaintiffs received valuable consideration in exchange for their release of all claims against Matsushita, and although the separation agreement was drafted by Matsu-

shita, there are no allegations that the terms of the plan are inequitable or unclear. Indeed, the final paragraph of the release indicated in bold print that by signing the release the employee was acknowledging that he had read the agreement, had the opportunity to review it with counsel, understood it, and agreed to its terms. (*Id.*).

■ However, the *Laniok* factors are not exclusive or dispositive. The ultimate test is whether the waiver was *in fact* knowing and voluntary. *See Laniok*, 935 F.2d at 1368. As with any other contractual release, circumstances evincing fraudulent inducement, misrepresentation, mutual mistake, or duress would justify setting aside the release. *See, e.g., Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40 (2d Cir.1991) (release will be denied effect when based on misrepresentation of a material fact); *Fournier v. Canadian Pacific Railroad*, 512 F.2d 317 (2d Cir. 1975) (In a suit under the Federal Employers' Liability Act, a release may be set aside if both parties acted under a mutual mistake of fact or employer's representative deceived plaintiff); *Ott v. Midland–Ross Corp.*, 600 F.2d 24 (6th Cir.1979) (If employer made misrepresentation of material fact for purpose of inducing employee to release it from liability under Title VII, it would be estopped to interpose release as bar to suit, provided employee acted in justifiable reliance upon misrepresentation); *Fonseca v. Columbia Gas Systems, Inc.*, 37 F.Supp.2d 214, 229 (W.D.N.Y.1998) ("In general, a release which has been procured through fraud, misrepresentation, or deceit is not a bar to subsequent actions by the party executing the release.").

Plaintiffs allege that they were fraudulently induced into participating in Matsushita's Voluntary Retirement program, and thereby misled into signing the releases as a contingency of such participation.

Matsushita argues that, as in *Hogan,* the releases should be enforced because plaintiffs were not justified in relying on Matsushita's "estimates" of pension benefits. In *Hogan,* Judge Collins determined that the plaintiff was not justified in relying on predictions by personnel at the defendant company that plaintiff's division would no longer exist after the company's impending acquisition. 165 F.Supp.2d at 63. Unlike *Hogan,* however, the statements made in this case were objective and capable of being factually verified. They were not predictions as to future actions which might or might not be taken by the employer after an acquisition. *See Hogan,* 165 F.Supp.2d at 65. As already discussed, the plaintiffs were justified in relying on these statements. Thus, taking all of the allegations in the complaint as true, Matsushita's fraudulent inducement renders the releases signed by plaintiffs unenforceable at this stage of the proceeding.

Moreover, plaintiffs' failure to tender-back their lump sum retirement payments does not constitute a ratification of the release. Plaintiffs do not seek rescission of their resignations; they essentially request the difference between the benefits that they were promised by Matsushita and the amount they actually received. There is no dispute that plaintiffs are entitled to the payments they did receive. The only question is whether they are entitled to additional payments to compensate them for Matsushita's alleged fraud. Under the circumstances, it would make little sense to require plaintiffs to tender back the payments they are obviously entitled to in order to pursue a claim for fraud.

**3. Failure to Exhaust Administrative Remedies Does Not Bar a Suit Alleging Violations of the ERISA Statute Rather Than Violations of the Terms of the Retirement Plan**

 As the Second Circuit recognized in *Kennedy v. Empire Blue Cross &* *Blue Shield,* 989 F.2d 588, 594 (2d Cir. 1993), there is a "firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." (internal citations omitted). "The exhaustion requirement is a jurisdictional prerequisite to a suit for benefits claimed pursuant to 29 U.S.C. § 1132." *Benitez v. Local 32B–32J Service Employees Int'l Union,* 1996 WL 675600, *2 (E.D.N.Y. Nov.14, 1996) (citing *Ludwig v. NYNEX Service Co.,* 838 F.Supp. 769, 781 (S.D.N.Y.1993).) To satisfy the exhaustion requirement, the plaintiff is required to utilize all administrative remedies provided by the retirement plan. *See Leonelli v. Pennwalt Corp.,* 887 F.2d 1195, 1199 (2d Cir.1989). Defendant moves to dismiss the complaint because plaintiffs did not allege or pursue full exhaustion of the administrative remedies provided under both the Matsushita and Panasonic retirement plans.

Plaintiffs argue that the exhaustion doctrine should apply only to plan-based claims, not the type of statute-based claim asserted here. They point to a number of Circuits that have recognized this distinction between statutory claims and plan-based claims. *See Smith v. Sydnor,* 184 F.3d 356, 364–65 (4th Cir.1999); *Chailland v. Brown & Root, Inc.,* 45 F.3d 947 (5th Cir.1995); *Richards v. General Motors Corp.,* 991 F.2d 1227 (6th Cir.1993); *Held v. Manufacturers Hanover Leasing Corp.,* 912 F.2d 1197 (10th Cir.1990); *Zipf v. American Telephone & Telegraph Co.,* 799 F.2d 889, 891–92 (3d Cir.1986); *Amaro v. Continental Can Co.,* 724 F.2d 747, 749–50 (9th Cir.1984). These cases reasoned that while plan fiduciaries may have expertise in interpreting the terms of the plan itself, statutory interpretation is the province of the judiciary. *See, e.g., Amaro,* 724 F.2d at 751. The cases also noted that Section 503 of ERISA, the provision from which

the exhaustion doctrine arose, only refers to procedures regarding claims for benefits. *See, e.g., Zipf,* 799 F.2d at 891.

In contrast to the Circuits noted above, the Seventh and Eleventh Circuits have applied the exhaustion doctrine to both plan-based and statutory-based claims, reasoning that regardless of the nature of the ERISA claim, administrative review enables plan administrators to apply their expertise and assemble a factual record that will assist in resolving those claims that are eventually litigated, and further serves to reduce the number of frivolous lawsuits. *See Mason v. Continental Group, Inc.,* 763 F.2d 1219, 1227 (11th Cir.1985); *Kross v. Western Electric Co.,* 701 F.2d 1238 (7th Cir.1983). However, the Seventh Circuit has since modified its decision and permitted district courts to use their discretion in deciding whether exhaustion should be required in a given case. *Lindemann v. Mobil Oil Corp.,* 79 F.3d 647, 649–50 (7th Cir.1996).

The Second Circuit has yet to address the specific question of whether exhaustion is required for statutory-based claims under ERISA as well as plan-based ones. It has recognized, however, that the primary purposes of the exhaustion requirement are to: "(1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not *de novo." Davenport v. Harry N. Abrams, Inc.,* 249 F.3d 130, 132–34 (2d Cir.2001) (quoting *Kennedy,* 989 F.2d at 594). Matsushita argues that requiring exhaustion under § 1132(a)(3) is consistent with these purposes. However, all of the cases it cites involve plan-based claims for benefits that have been wrongfully withheld or de-

nied. In contrast, the claim here is equitable in nature and concerns Matsushita's alleged fraudulent and misleading administration of the plan, not an interpretation of the terms of the plan itself. District courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA violation. *See, e.g., Gray v. Briggs,* 1998 WL 386177, *7 (S.D.N.Y. July 7, 1998) ("there is no exhaustion requirement in the Second Circuit with respect to statutory ERISA claims"); *MacKay v. Rayonier, Inc.,* 25 F.Supp.2d 47, 50 (D.Conn.1998) (exhaustion of administrative remedies not required where claimant asserts wrongful termination under ERISA § 510); *Novak v. TRW, Inc.,* 822 F.Supp. 963, 969 (E.D.N.Y.1993) (same); *Molina v. Mallah Organization, Inc.,* 804 F.Supp. 504, 511–12 (S.D.N.Y.1992) (same); *Lawford v. New York Life Insurance Co.,* 739 F.Supp. 906, 911–912 (S.D.N.Y.1990) (same); *Pennachio v. Farrell Lines, Inc.,* 1987 WL 26796, *4 (S.D.N.Y. Nov.25, 1987) (same); *Corbett v. International Ass'n of Bridge, Structural and Ornamental Iron Workers,* 1992 WL 178762 at *7 (E.D.N.Y. July 14, 1992) (no exhaustion required for retaliation claim under § 510).

While most of these cases have repudiated the exhaustion doctrine as a prerequisite to statutory ERISA claims in the context of § 510 violations, the reasoning of these cases is just as persuasive in the context of fraud-based equitable estoppel. In *Pennachio,* for instance, Judge Carter recognized that 29 U.S.C. § 1133 had been interpreted to deprive federal courts of jurisdiction to review the denial of benefits until the decision of the plan's trustees was final. *Pennachio,* 1987 WL 26796 at *4. However, it found that in cases involving allegations of a discriminatory discharge, "the issue is *not* an alleged violation of the terms of a pension plan, but an alleged violation of ERISA itself." *Id.*(emphasis

in original) (citing *Amaro,* 724 F.2d at 752). Because of this distinction, "an application to the pension fund might not achieve the relief the plaintiff seeks." *Id.* For this reason, Judge Carter held that the exhaustion requirement was "inessential" to the plaintiff's claim that he was discharged to prevent him from attaining accrued and future pension benefits. *Id.*

Plaintiffs' complaints of fraudulent inducement in this case are not based on a misinterpretation or misapplication of the terms of the pension plan. Rather, they claim that they were misled by false information into participating in the voluntary retirement plan, and in the absence of such fraud, would never have retired in the first place. Thus, as in *Pennachio,* "the issue is *not* an alleged violation of the terms of a pension plan, but an alleged violation of ERISA itself." 1987 WL 26796 at *4. As plaintiffs reasonably contend, the administrative procedures and remedies provided for in the Matsushita and Panasonic plans are designed to deal with erroneously denied benefits or misapplication of the terms of the plan. They do not encompass equitable relief for employees who claim their participation in the voluntary retirement plan was anything but voluntary, nor are they equipped to address potential fraudulent action on the part of plan administrators. The inadequacy of plaintiffs' administrative options strongly indicates that the exhaustion requirement is just as inessential in this case as it was in *Pennachio.*

Similarly, in *Lawford,* Judge Leisure found the exhaustion of administrative remedies unnecessary for a plaintiff claiming he was terminated just seven months short of the date his pension benefits would have vested. Recognizing that the Second Circuit had not reached the question of exhaustion of administrative remedies in statutory ERISA actions, Judge

Leisure examined the split in the circuits concerning this issue and found the majority position expressed by *Amaro* and *Zipf* to be persuasive. *Lawford,* 739 F.Supp. at 911–12. In particular, *Lawford* adopted the Third Circuit's detailed analysis of the legislative history of § 510 as compelling:

> [W]e find no indication in the Act or its legislative history that Congress intended to condition a plaintiff's ability to redress a statutory violation in federal court upon the exhaustion of internal remedies. The provision [in the ERISA statute] relating to internal claims and appeals procedures, Section 503, refers only to procedures regarding claims for *benefits.* There is no suggestion that Congress meant for these internal remedial procedures to embrace Section 510 claims based on violations of ERISA's substantive guarantees. On the contrary, the legislative history suggests that the remedy for Section 510 discrimination was intended to be provided by the courts.

*Lawford,* 739 F.Supp. at 912 (emphasis in original) (quoting *Zipf,* 799 F.2d at 891–92) (citations omitted). Judge Leisure went on to find that the cases supporting an exhaustion requirement involved claims for benefits owing, not a statutory claim, and took guidance from the Second Circuit's pronouncement in *Bird v. Shearson Lehman/American Express, Inc.,* 871 F.2d 292 (2d Cir.), *vacated for reconsideration,* 493 U.S. 884, 110 S.Ct. 225, 107 L.Ed.2d 177 (1989): "That Congress envisioned the federal courts as the central forum for enforcement of the statute is the inescapable conclusion from the plain meaning of the wording of ERISA." *Lawford,* 739 F.Supp. at 912 (quoting *Bird,* 871 F.2d at 297).

Judge Leisure also stated in *Lawford,* that "[t]here is no evidence in any of the cases supporting an exhaustion require-

ment that Congress explicitly intended that claimants alleging wrongful termination should be required to avail themselves of the internal procedures of the entity which allegedly discriminated against them." 739 F.Supp. at 912. Persuaded by this reasoning, Judge Knapp found in *Molina:* "[a]s plaintiff's claim is that defendants acted to hide the plans from them, and to dissuade by illegal means their participation therein, a requirement that they apply to the plans for a ruling on their eligibility is nonsensical." 804 F.Supp. at 511–12. Analogously, since plaintiffs have alleged misrepresentation and fraudulent inducement, it would be pointless to require them to avail themselves of the internal procedures of the entity which allegedly defrauded them. To dismiss their claims because they have not done so would be unreasonable.

Moreover, the logic of *Lawford* has been extended to other statutory claims under ERISA that bear considerable affinity to plaintiffs' equitable estoppel and fraud claims. In *Gray,* Judge Cote found exhaustion of administrative remedies unessential in a case where defendants allegedly violated their obligations as fiduciaries under ERISA by investing plan funds unwisely and not solely in the participants' interest. 1998 WL 386177 at *7. Like the claims in this case, the breach of fiduciary duty claims at issue in *Gray* were equitable in nature and not explicitly brought under § 510. Nevertheless, relying on *Lawford,* Judge Cote held that "there is no exhaustion requirement in ERISA suits alleging a statutory violation rather than a denial of benefits." *Id.*

Finally, even if exhaustion were applicable in this case, the circumstances portend that any attempt by plaintiffs to engage the internal remedial mechanism would be an exercise in futility, "since their complaint alleges bad faith on the part of the Plan's trustees and administrators." *Gray,* 1998 WL 386177 at *7. "The 'futility doctrine' is perhaps best understood as a term of art that considers whether, in light of both the claimant's and the plan administrator's actions, it is *fair* to require the dismissal of the claimant's suit pending her reapplication for benefits in accordance with the procedures set forth in the summary plan description." *Ludwig,* 838 F.Supp. at 781 (emphasis in original). In cases where the plan fiduciary has acted in bad faith or in breach of its fiduciary duties, federal courts have invoked the futility doctrine and waived exhaustion as a precondition for judicial review under ERISA. *See, e.g., Ludwig,* 838 F.Supp. at 781–82 (collecting cases); *Riggs v. A.J. Ballard Tire & Oil Co.,* 1992 WL 345584, *2 (4th Cir. Nov.19, 1992). Plaintiffs here have alleged that Matsushita intentionally or recklessly made false statements to induce their participation in the early retirement plan. "If, drawing all inferences in the plaintiffs' favor, one assumes that the allegations of wrongdoing are true, then internal remedies indeed may have proven futile." *Gray,* 1998 WL 386177 at *7.

Whether I decide that the exhaustion doctrine does not apply to statutory ERISA claims or that the doctrine, while applicable, should be waived on the basis of futility, the end result is the same: Matsushita's motion to dismiss for failure to exhaust administrative remedies must be denied.

### 4. Equitable Relief Under § 1132(A)(3) Does Not Encompass All of the Remedies Plaintiffs Request

#### A. The Monetary Awards For Compensatory Damages Plaintiffs Request Do Not Constitute "Equitable Relief" as that Term Has Been Interpreted by the Supreme Court

The complaint requests remedies in the form of compensatory damages,

front pay and benefits, punitive damages, and "such other and further relief as may be just and proper." (Cmplt.¶ 46). However, the Supreme Court's recent decision in *Great–West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), has severely curtailed the type of remedies available under § 1132(a)(3).

Section § 1132(a)(3) of ERISA provides, in pertinent part:

A civil action may be brought—

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act of practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or terms of the plan.

The equitable relief provided for by § 1132(a)(3) has been limited to " 'those categories of relief that were typically available in equity.' " *Great–West Life,* 122 S.Ct. at 718 (quoting *Mertens v. Hewitt Associates,* 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)). In *Great–West Life,* the Supreme Court directly addressed whether an action to recover money pursuant to a reimbursement provision of an ERISA plan qualifies as "equitable relief" under §§ 502(a)(3). The Court held that an injunction ordering specific performance under the plan, in the form of reimbursement, would not constitute equitable relief because "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity." *Id.* at 713.

The greater ramification of *Great–West Life,* however, is the Court's rejection of the plaintiff's claim as one for equitable restitution. The Supreme Court held that a claim for restitution which seeks to impose "personal liability" on a defendant is not authorized by § 1132(a)(3). *Id.* at 719. In distinguishing restitution in equity from restitution at law, the Court stated that "a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at 714. Restitution in equity is not available, however, where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains." *Id.* In such cases, " '[the plaintiff's] claim is only that of a general creditor,' and the plaintiff 'cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant].' " *Id.* (internal citations omitted). As the Court explained, "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* In dismissing the plaintiffs' claim as one for a legal remedy unavailable under § 1132(a)(3) rather than for equitable relief, the Supreme Court reasoned that "[t]he basis for petitioners' claim is not that respondents hold particular funds that, in good conscience, belong to petitioners, but that petitioners are contractually entitled to *some* funds for benefits that they conferred. The kind of restitution that petitioners seek, therefore, is not equitable—the imposition of a constructive trust or equitable lien on particular property—but legal—the imposition of personal liability for the benefits that they conferred upon respondents." *Id.* at 715 (emphasis in original).

In essence, *Great–West Life* dictates that plaintiffs' claims for compensatory payments equal to the difference between the benefits they received and those they

were promised is not a viable remedy under § 1132(a)(3) because "[a]lmost invariably ... suits seeking ... to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Id.* at 713. Plaintiffs' claims here for compensatory and punitive damages are illustrative of the type of tort-related monetary remedies that were not typically available in equity, and fall outside the Supreme Court's formulation of "equitable relief."

Plaintiffs argue that their claim for relief is essentially an equitable make-whole remedy, relying on the Second Circuit's decision in *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138 (2d Cir.1999). In *Strom*, decided prior to the Supreme Court's seminal decision in *Great–West Life*, the court held that the recovery of life insurance proceeds that the plaintiff would have received but for her late husband's employer's breach of fiduciary duty was a form of "equitable relief" under § 1132(a)(3). *Id.* at 143–50. The *Strom* Court reasoned that although money damages are usually legal in nature, the relief sought by the plaintiff was similar to the type of monetary relief traditionally awarded in an equitable action to enforce the positive duties of loyalty and prudence owed by a fiduciary to a trust. *Id.* at 143–45. In addition, the court stated that the remedy was indistinguishable from the remedy of back pay available under the National Labor Relations Act and Title VII—a type of relief that courts have always treated as equitable, and which Congress understood to be a facet of equitable relief when it drafted ERISA's remedial scheme in 1973:

> The relief sought in this case is indistinguishable from back pay in any material respect. Like a back pay award, its objective is to eliminate the direct eco-

nomic effect of an alleged violation of the statute. [*See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) ]. It includes none of the other subjects of compensation found in traditional tort actions. It is, in the words of the Supreme Court, simply a "make whole" remedy. *Id.* at 419, 95 S.Ct. 2362.

*Strom,* 202 F.3d at 147.

To a great extent, *Strom* also based its decision on the Supreme Court's holding in *Varity Corp. v. Howe,* 516 U.S. 489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) that section 1132(a)(3) "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations [of ERISA] that § 502 does not elsewhere adequately remedy." In *Varity,* the Court noted that where Congress provided adequate relief for a beneficiary's injury under other ERISA provisions, there would likely be no need for the "further equitable relief" of § 1132(a)(3). *Id.* at 515, 116 S.Ct. 1065. However, where plaintiffs cannot proceed under subsection 502(a)(1) or 502(a)(2), "[t]hey must rely on the third subsection [1132(a)(3) ] or they have no remedy at all." *Id.* The plaintiffs in *Varity* claimed that their former employer breached its fiduciary duties by tricking them into withdrawing from their old pension plan and switching to a plan which the defendant knew to be insolvent. Because the plaintiffs were no longer members of the plan, they could not sue under § 502(a)(1), nor could they bring suit under § 502(a)(2), which does not provide a remedy for individual beneficiaries. The Court nevertheless found that the plaintiffs could bring suit for equitable relief under § 1132(a)(3) because plaintiffs lacked any other remedial option and "[w]e are not aware of any ERISA-related purpose that denial of a remedy would serve. Rather, we believe that granting a remedy is consistent with

the literal language of the statute, the Act's purposes, and pre-existing trust laws." *Id.*

Likewise, in *Strom,* the Court found that plaintiff could not sue under section 502(a)(1)(B) because there were no additional benefits due her under the plan. Nor was 502(a)(2) available to her as an individual beneficiary. *Strom,* 202 F.3d at 138. Relying on the reasoning of *Varity,* the Second Circuit held that the plaintiff's lack of alternative remedies justified awarding her relief under § 1132(a)(3):

> We are aware of no ERISA-related purpose that would be served by denying her any remedy at all, assuming that she can prove the allegations of the complaint. Allowing her to recover the benefit that she would have received absent the alleged breach of duty, but not consequential or other damages, would be entirely consistent with Congress' and the Court's characterization of the "make whole" remedy of back pay as equitable in character notwithstanding the fact that an employer who engages in unlawful employment discrimination ordinarily is not enriched thereby. Hence, granting this remedy would be consistent with the language and purposes of the statute.

*Id.* As in *Strom,* plaintiffs here cannot bring suit under § 502(a)(2) because they are individual beneficiaries. Plaintiffs also contend that § 502(a)(1)(B) is inapplicable because they are not entitled to additional benefits under the terms of the Matsushita retirement plan. Thus, assuming plaintiffs' assessment of § 502(a)(1)(B) is accurate, § 1132(a)(3) represents their sole avenue of relief. Plaintiffs seek to be made whole for the losses engendered by Matsushita's fraudulent inducement of their early retirement. Although part of the demand is designated as "compensatory damages," plaintiffs argue that they are

actually seeking to recover for the value of the position they held and were misled into giving up by Matsushita's misrepresentations. Similar to the claims in *Strom* and *Varity,* plaintiffs request that which they would have received or been entitled to if not for the plan administrator's breach of its duties. This is exactly the type of "make-whole" remedy envisioned by *Strom.* There also appears to be no ERISA-related purpose for denying plaintiffs any remedy at all; indeed, it seems utterly absurd that plaintiffs who have been defrauded into signing ERISA contracts would lack any recognizable recompense. The purposes of the ERISA statute surely support an equitable remedy in this case.

Unfortunately for plaintiffs, however, the Supreme Court's subsequently overly narrow reading of "equitable relief," as that term is defined in § 1132(a)(3), appears to foreclose *Strom's* "make-whole" remedial scheme. *See, e.g., Augienello v. Coast–To–Coast Financial Corp.,* 2002 WL 1822926, *5–6 (S.D.N.Y. Aug.7, 2002) ("there is reason to believe *Great–West Life* repudiated the Second Circuit's reasoning in *Strom v. Goldman Sachs,*" so that "the reasoning of *Great–West Life* makes it difficult to conceive of the relief sought by plaintiffs (principally monetary damages) as a form traditionally available in equity"); *Bona v. Barasch,* 2003 WL 1395932, *11 (S.D.N.Y. Mar.20, 2003) ("Because *Strom's* holding cannot be reconciled with *Great–West,* I conclude that *Strom* does not control the present case; rather, *Great–West* controls, and *Great–West* bars Individual plaintiffs' request for monetary relief from the trustees [for a breach of fiduciary duty]").

Judge Mukasey's decision in *Kishter v. Principal Life Insurance Co.,* 186 F.Supp.2d 438 (S.D.N.Y.2002) is particularly instructive. The plaintiff in *Kishter,*

the executor of a deceased employee's estate, alleged that the plan administrator breached its fiduciary duty by telling the employee that she was covered for life insurance when, in fact, she was not. The plaintiff admitted that the employee was not entitled to benefits under the plan itself, but alleged that the employer should be liable for telling the employee that she was, which effectively prevented her from seeking other coverage. *Id.* at 442. In other words, the plaintiff sought "an individualized recovery of at least some part of the money that he lost because [the employer] did not provide [the employee] with complete and accurate information about her life insurance policy." *Id.* at 446. Recognizing that this type of relief was supported by *Strom,* Judge Mukasey nonetheless rejected plaintiff's claim because "there is substantial reason to believe that *Great–West Life* has repudiated *Strom* and its reasoning." *Id.* at 444. Indeed, Judge Mukasey found that the Supreme Court "expressly rejected" each of the arguments that the *Strom* Court used to justify its decision. *Id.* at 445.

First, *Great–West Life* "reiterated its rejection of the view that 'the special equity-court powers applicable to trust define the reach of § 502(a)(3).'" *Kishter,* 186 F.Supp.2d at 444 (quoting *Great–West Life,* 122 S.Ct. at 718). Thus, the Court limited a plaintiff's ability to recast actions for forced monetary payments as equitable remedies:

> Outside of an action for restitution, as narrowly defined by the Court in *Great–West Life,* it is hard to see how a forced payment of life insurance proceeds could be a remedy that was "typically available in equity," even if breach of fiduciary duty claims sometimes necessitated such a remedy pursuant to "the special equity-court powers applicable to trusts."

*Kishter,* 186 F.Supp.2d at 444–45. In addition, the Supreme Court rejected *Strom's* analogy to back-pay under Title VII, and held that such relief is not a stand-alone equitable remedy:

> The *Strom* Court had reasoned that ordering the payment of life insurance benefits to remedy a breach of fiduciary duty was indistinguishable from back pay, which was treated as an equitable remedy under Title VII. *Strom,* 202 F.3d at 145–50. However, the Supreme Court in *Great–West Life* denied that back pay is a form of equitable relief, stating instead that back pay may be "made part of an equitable remedy" that includes the hiring or reinstatement of employees, but is not an equitable remedy in itself. *Great–West Life,* 122 S.Ct. at 717 n. 4

*Kishter,* 186 F.Supp.2d at 445. Finally, the Supreme Court rejected the notion that § 1132(a)(3) had to be read expansively to provide catch-all remedies for violations of the ERISA statute that were not explicitly remedied by other provisions:

> Furthermore, the Court declined to attach significance independent of the text to Congress's remedial purpose in drafting ERISA § 502(a)(3). Although the *Strom* Court had found such Congressional intent highly instructive, *see Strom,* 202 F.3d at 149–50, the Court in *Great–West Life* referred to ERISA as a "carefully crafted and detailed enforcement scheme" in which Congress had expressly declined to make available any form of legal relief available. *Great–West Life,* 122 S.Ct. at 718 (quoting *Mertens,* 508 U.S. at 254, 113 S.Ct. 2063) (internal quotation marks omitted). The Court cautioned that "vague notions of a statute's 'basic purposes' are ... inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Id.* (quoting *Mertens,* 508

U.S. at 261, 113 S.Ct. 2063) (internal quotation marks omitted).

*Kishter,* 186 F.Supp.2d at 445.

Recognizing that the Second Circuit's reasoning in *Strom* had been superseded by *Great–West Life,* Judge Mukasey granted summary judgment because "there is no equitable remedy available under ERISA § 502(a)(3) that can make plaintiff whole under the circumstances." *Id.* Specifically, he found that plaintiff's claim to recover damages caused by reliance on the defendant's alleged misstatements are exactly the kind of compensatory damages that the Court in *Mertens* decided are not an equitable remedy. *Id.* at 446 (citing *Mertens,* 508 U.S. at 255–63, 113 S.Ct. 2063). Nor could they be considered an equitable action for restitution given the Supreme Court's reasoning in *Great–West Life. Id.* at 445 (citing *Great–West Life,* 122 S.Ct. at 718).

For the same reasons as *Kishter,* it seems unlikely that plaintiffs' claims here can be remedied under § 1132(a)(3) according to a "make-whole" theory. Plaintiffs' reliance on *Strom* is misplaced since the core of the Second Circuit's decision was expressly rejected by the Supreme Court in *Great–West Life.* One significant distinction between this case and *Great–West Life* and *Kishter,* is that the plaintiffs in those cases were suing third parties who were not in possession of disputed funds that could be the subject of a constructive trust. *See Great–West Life,* 122 S.Ct. at 714; *Kishter,* 186 F.Supp.2d at 445. Here, plaintiffs may argue that the specific, identifiable property they seek is in the hands of Matsushita. However, this distinction does little to overcome the fact that plaintiffs' claim is essentially one for money damages as a result of defendant's breach of a legal duty. This is precisely the type of claim rejected by the Supreme Court as an impermissible remedy under

§ 1132(a)(3). Thus, plaintiffs' claims for compensatory damages must be stricken.

*B. Punitive Damages Are Not Available in ERISA Actions Under § 1132(a)(3)*

To the extent that plaintiffs request punitive damages, that demand must also be stricken from the complaint. The Supreme Court has specifically held that punitive damages do not constitute equitable relief within the meaning of § 1132(a)(3) of ERISA. *Mertens v. Hewitt Associates,* 508 U.S. 248, 255–58, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Plaintiffs' reliance on *Reeves v. Continental Equities Corp.,* 767 F.Supp. 469, 474 (S.D.N.Y.1991), a district court opinion decided before *Mertens,* is misplaced. *See Livers v. Wu,* 6 F.Supp.2d 921, 930 (N.D.Ill.1998) (because the holding in *Reeves* was "expressly premised on the fact that, at the time, the United States Supreme Court had not ruled on the availability of punitive damages under ERISA," it is "no longer reliable authority").

*C. Plaintiffs' May Seek Equitable Remedies of Front pay and Reformation*

The remaining allegations in the complaint seek front pay and "such other and further relief as may be just and proper." (Cmplt.¶ 46). Reinstatement of the positions plaintiffs surrendered in reliance on Matsushita's alleged fraud is a traditional form of equitable remedy. *See, e.g., Great–West Life,* 122 S.Ct. at 717, n. 4 (recognizing that reinstatement, unlike backpay, is a true equitable remedy). If reinstatement is not feasible, as plaintiffs contend, then front pay is a viable equitable remedy to compensate plaintiffs for the value of their lost positions. *See Schwartz v. Gregori,* 45 F.3d 1017, 1021–23 (6th Cir.1995) (allowing award of back and

front pay as alternative equitable remedy to reinstatement for retaliatory discharge under § 502(a)(3)); *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1100 (8th Cir. 1982) (recognizing that front pay is a viable form of equitable relief where restitution is impractical); *Folz v. Marriott Corp.*, 594 F.Supp. 1007, 1018–19 (W.D.Mo. 1984) (awarding front pay where restitution was infeasible).

█ In addition, plaintiffs' request for "other" relief is broad enough to encompass another traditional form of equitable remedy: reformation. "[R]eformation is available in cases of fraud and mutual mistake." *AMEX Assurance Co. v. Caripides*, 316 F.3d 154, 161 (2d Cir.2003); *see also Esoldi v. Esoldi*, 930 F.Supp. 1015, 1022 (D.N.J.1996) (the doctrine of reformation is available in "situations where one party enters into an agreement on certain terms based on a mistake of fact induced by the other party's misrepresentation"); 3 E. Allen Farnsworth, *Farnsworth on Contracts* § 7.5 (2d ed.1998) (explaining that the equitable remedy of reformation is available in cases of mutual mistake or "when only one party is mistaken as to the contents or effect of a writing if that mistake was induced by the other party's fraudulent misrepresentation"). As explained in the Restatement (Second) of Contracts:

> If a party's manifestation of assent is induced by the other party's fraudulent misrepresentation as to the contents or effect of a writing evidencing or embodying in whole or in part an agreement, the court at the request of the recipient may reform the writing to express the terms of the agreement as asserted,
>
> (a) if the recipient was justified in relying on the misrepresentation, and
> (b) except to the extent that rights of

third parties such as good faith purchasers for value will be unfairly affected. Restatement (Second) of Contracts § 166 (1981). Judge Leval's opinion in *AMEX Assurance* illustrates the reasoning prompting a court to reform an agreement procured by fraud to more accurately reflect the actual expectations of the parties:

> Ordinarily when parties have agreed to a written contract, disputes will be governed by its terms. If one party is favored by a term of the contract, that party is presumed to have bargained for that term and relied on it, and is therefore entitled to judgment on the basis of that term unless a powerful reason exists to the contrary. Courts have generally found that sufficient reason exists to deprive the party of its reliance on the advantageous term where the party has procured the contract term through fraud on the other party to the contract. In such cases, the contract will be reformed.

316 F.3d at 162.

Reformation has been recognized as an appropriate equitable remedy for certain ERISA violations. *See, e.g., Johnson v. Allsteel, Inc.*, 259 F.3d 885, 890–91 (7th Cir.2001) (finding that reformation of an ERISA plan was a viable redress for an employee's injuries caused by the employer/plan administrator's unilateral amendment); *International Union v. Murata Erie North America*, 980 F.2d 889, 907 (3d Cir.1992) (holding that the equitable doctrine of contract reformation due to a scrivener's error is consistent with the purposes of ERISA); *Delgrosso v. Spang and Co.*, 769 F.2d 928, 937–38 (3d Cir.1985) (reforming pension agreement to reflect original intent of parties where the employer, acting as plan administrator, unilaterally amended the agreement to its benefit); *Carollo v. Cement and Concrete Workers Dist. Council Pension Plan*, 964

F.Supp. 677, 684, 689 (S.D.N.Y.1997) (permitting claim for reformation of pension plan where plaintiff plan participant alleged violation of the ERISA statute and trustees' fiduciary duties); *DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund,* 975 F.Supp. 258, 267, 270 (S.D.N.Y. 1997) (instructing trustees to reform plan to comply with ERISA and ordering recalculation of benefits due to individual plaintiff); *Aramony v. United Way of America,* 949 F.Supp. 1080, 1085 (S.D.N.Y.1996) (recognizing that plan participant could seek reformation of the plan under the terms of ERISA or federal common law).

Reformation was a form of relief unavailable to the plaintiffs in *Great–West Life,* because the plaintiffs were seeking specific performance of an existing contractual obligation, not asking to rectify a misunderstanding between the parties as to the actual terms of an agreement. Thus, there is little guidance as to whether the Supreme Court's contraction of equitable relief under § 1132(a)(3) precludes reformation as well as most forms of restitution. But at least one court has intimated that reformation remains a viable equitable remedy after *Great–West Life. See Bona,* 2003 WL 1395932 at *12. Although Judge Mukasey ultimately found that the plaintiffs' allegations did not support a claim for reformation, he suggested that the result would differ if the plaintiff had alleged fraudulent inducement. *Id. Bona* also recognized a distinction between the traditional equitable remedy of reformation and the quasi-equitable remedies extinguished by *Great–West Life* such as restitution and the "make whole" remedy expounded by the Second Circuit's decision in *Strom. Id.* at *11–12. Moreover, the continued viability of reformation is consistent with the reasoning in *Great–West Life,* as it was a type of equitable relief typically available prior to the fusion of law and equity. *See U.S. v. One 1976*

*Mercedes Benz 280S, Serial No. 11602012072193,* 618 F.2d 453, 457 (7th Cir.1980); Roscoe Pound, *Jurisprudence* (1959) I, 427; II, 417–21; William S. Holdsworth, *A History of English Law* (1938) XII, 258–85, 583–605. Accordingly, reformation appears to be a tenable claim for relief in a suit for fraudulent inducement under ERISA.

**5. State Common Law Claims for Fraud or Misrepresentation are Preempted by ERISA**

■ Plaintiffs request to amend their complaint to assert a cause of action for common law fraud. Such an amendment would be futile, however, as any common law fraud cause of action on these facts is preempted by ERISA.

■ According to ERISA's preemption clause, ERISA supersedes "any and all State laws insofar as they relate to any employee benefit plan." 29 U.S.C. § 1144(a). In *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), the Supreme Court stated: "the express preemption provisions of ERISA are deliberately expansive, and designed to 'establish pension plan regulation as exclusively a federal concern.'" *Id.* at 45–46, 107 S.Ct. 1549 (quoting *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981)). Courts once interpreted this preemption clause by focusing on the question of whether a particular state law related to ERISA. *See, e.g., Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). However, this approach "proved to be a verbal coat of too many colors," and the Supreme Court more recently indicated that a more focused analysis should apply. *Plumbing Industry Board, Plumbing Local Union No. 1. v. E.W. Howell Co.,* 126

F.3d 61, 66 (2d Cir.1997) (describing the change in approach). Analysis of the preemption clause should begin with the "starting presumption that Congress does not intend to supplant state law." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). To overcome this presumption, a party must convince the court that there is something in the practical operation of the challenged state law to indicate that it is the type of law that Congress specifically aimed to have ERISA supersede. *See De Buono v. NYSA–ILA Med. And Clinical Servs. Fund,* 520 U.S. 806, 117 S.Ct. 1747, 1751–52, 138 L.Ed.2d 21 (1997).

■■■■ The Supreme Court has identified several ways in which the anti-preemption presumption can be overcome. First, preemption will apply where a state law clearly refers to ERISA plans in the sense that the measure acts immediately and exclusively upon ERISA plans or where the existence of an ERISA plan is essential to the law's operation. Second, a state law is preempted even though it does not refer to ERISA or ERISA plans if it has a clear connection with a plan in the sense that it mandates employee benefit structures or their administration or provides alternate enforcement mechanisms. *Plumbing Industry,* 126 F.3d at 67 (citations and quotations omitted). In *Aetna Life Ins. Co. v. Borges,* 869 F.2d 142 (2d Cir.1989), the Second Circuit held that:

> laws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee. Those that have not been preempted are laws of general application—often tradi-

tional exercises of state power or regulatory authority—whose effect on ERISA plans is incidental.

*Id.* at 146. Accordingly, "[w]hat triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit." *Id.* at 146–147.

■■■■ As the Supreme Court clarified in *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 137–38, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), "[t]he question whether a certain state action is pre-empted by federal law is one of congressional intent." The purpose of ERISA's preemption provision is "to ensure that plans and plan sponsors [are] subject to a uniform body of benefits law." *Travelers,* 514 U.S. at 656, 115 S.Ct. 1671. The term "state law" is understood to encompass state law causes of action as well as statutory law. *Id.* at 658–59, 115 S.Ct. 1671; see also 29 U.S.C. § 1144(c)(1). Thus, in *Ingersoll–Rand,* the Supreme Court held that a state common law claim for wrongful-discharge-to-deny-pension-benefits was preempted by ERISA where the plan at issue was an ERISA plan. 498 U.S. at 139–141, 111 S.Ct. 478. The Court reasoned that preemption was called for because "the existence of a pension plan [was] a critical factor in establishing liability under the [Texas] wrongful discharge law." *Id.* at 139–40, 111 S.Ct. 478. In fact, the state claim was only available in the pension context. *Id.* at 136, 111 S.Ct. 478. The Supreme Court considered it an easy case precisely because the state law cause of action was "specifically designed to affect employee benefit plans." *Id.* at 140, 111 S.Ct. 478 (quotation marks and citation omitted). The Court also reasoned that preemption was appropriate because the

development of such common law causes of action was likely to "give rise to different substantive standards applicable to the same employer conduct, requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." *Id.* at 142, 111 S.Ct. 478. Subsequently, in *Travelers*, the Supreme Court referred to such claims generally as being preempted because they amounted to "alternative enforcement mechanisms" to ERISA's civil enforcement regime. *Travelers*, 514 U.S. at 658–59, 115 S.Ct. 1671.

The Supreme Court's opinion in *Ingersoll–Rand* has been construed as preempting two kinds of state causes of action: (1) "where a plaintiff, in order to prevail, must plead, and the court must find, that an ERISA plan exists"; and (2) where there is no express preemption, but the cause of action "conflicts directly with an ERISA cause of action." *Vartanian v. Monsanto Co.*, 14 F.3d 697, 700 (1st Cir.1994). The plaintiff in *Vartanian* was an employee/plan beneficiary who alleged common law misrepresentation arising from his employer's statements concerning whether an early retirement offer would be made, which materially impacted the beneficiary's decision as to the timing of his retirement. *Id.* at 698–99. The Court concluded that dismissal of the misrepresentation claim was appropriate under the circumstances because there would be no cause of action if there were no plan. *Id.* at 700 ("The alleged misrepresentations by Monsanto relate to the existence of the 1991 Plan and in order to prevail under a state common law claim for misrepresentation, Vartanian would undoubtedly have to plead, and the Court would have to find, that the 1991 Plan exists.").

Plaintiffs contend that this case is controlled by *Geller v. County Line Auto Sales, Inc.*, 86 F.3d 18 (2d Cir.1996), in which the Second Circuit held that ERISA could not be used to deny a fraud victim recovery for a "garden variety fraud." In *Geller*, the Court first determined that a federal ERISA claim could not be sustained, but allowed the plaintiff's state common law claims to proceed because ERISA was not implicated. The claim in *Geller* involved "the outright squandering" of funds based on a fraudulent misrepresentation concerning an individual's employment status, which resulted in the payment of approximately $104,000 to an individual who was never employed by the company. *Id.* at 22. The Court found that a common law fraud claim brought by the benefit plan trustees against the company would "advance the rights and expectations of ERISA" without impermissibly interfering with Congress' carefully established enforcement scheme because it did not relate to the operation or management of the pension plan. *Id.* at 22–23. Indeed, the Court specifically found that "[t]he plan was only the context in which this garden variety fraud occurred." *Id.* at 23.

In contrast to *Geller*, the misrepresentations at issue here clearly implicate the operation and management of a pension plan. This is not a situation of "garden variety fraud" where the plan is merely the vehicle for otherwise fraudulent actions. Rather, plaintiffs' cause of action is premised on the very existence of the plan. As in *Ingersoll–Rand*, to succeed on their common law fraud claims plaintiffs must plead and prove that a pension plan exists, that Matsushita misrepresented the terms of the plan, and that they relied on those misrepresentations. Since plaintiffs would have no cause of action in the absence of an established pension plan, their claim for common law fraud is preempted. *See Smith v. Dunham–Bush, Inc.*, 959 F.2d 6 (2d Cir.1992); *Ullrich v. Linotype–Hell Co.*, 187 F.Supp.2d 68 (E.D.N.Y.2002); *Hamburger v. Southern New England*

*Telephone Co.,* 1998 WL 241214 (D.Conn. May 6, 1998).

In *Smith,* the plaintiff set forth causes of action for breach of contract and negligent misrepresentation, claiming that his employer, Dunham–Bush, had made an oral promise to pay certain pension-related benefits in order to induce him to relocate to Connecticut. According to Smith's complaint, when he "expressed concerns about the inferiority of the United States affiliate's pension plan, Elliot assured him that Dunham–Bush would provide him with a benefits package comparable to what he would have received upon his retirement in the United Kingdom." *Smith,* 959 F.2d at 7. In upholding the district court's finding that the state law claims were preempted, the Second Circuit found that Smith "makes explicit reference to the pension plan in his complaint . . . . the oral representation underlying this suit deals expressly and exclusively with the appellant's benefits." *Id.* at 10. Additionally, "the calculation of the promised supplemental benefits" would implicate the ERISA plan. *Id.* In reality, the Second Circuit concluded, Smith's suit represented "an attempt to supplement the plan's express provisions and secure an additional benefit." *Id.* Thus, since the existence of an ERISA pension plan "would be a critical factor in establishing the extent of liability under state common law," the plaintiff's common law claims were preempted. *Id.* at 10–11.

A similar decision was reached in *Hamburger,* where the plaintiff elected to participate in an "Early Out Offer" based on his employer's representation as to the benefits he would receive. Subsequently, the plaintiff was informed, without explanation, that the sum he was to receive was significantly less than what had been earlier represented. Dismissing the plaintiff's state law claim of negligent misrepresentation, the district court held that the claim "necessarily relies on the existence of an ERISA plan. . . . [I]t only arises because of the existence of an ERISA Plan." *Hamburger,* 1998 WL 241214 at *3. As the court explained:

> In order to succeed on this negligent misrepresentation claim, Hamburger would have to show that (1) an ERISA plan existed; (2) Hamburger was entitled to the payment of a certain amount of funds under this plan; and (3) the defendants negligently misrepresented the amount that Hamburger would be entitled to receive. Thus, because the negligent misrepresentation claim is intrinsically related to the underlying employee [benefit] plan, it is preempted by ERISA.

*Id.* at *3 (internal quotation marks omitted). Accordingly, the court held that Hamburger's negligent misrepresentation claim was "intrinsically related to the underlying employee benefit plan [and] is preempted by ERISA." *Id.* (internal quotation marks and citation omitted).

Judge Seybert's decision in *Ullrich* is particularly instructive, as the misrepresentation claim in that case is closely analogous to the claims at issue here. In *Ullrich,* the plaintiff was terminated in 1993 pursuant to a reduction-in-force. In 1994, the plaintiff sought to be rehired, under the condition that his benefit entitlements would be based on his original date of hire in 1975, rather than his rehire date in 1994. Upon being rehired, but before commencing employment, the plaintiff received two separate letters from the defendant's personnel department, which indicated that all benefit entitlements would, in fact, be based on his initial hire date in 1975. Three years later, in 1997, the plaintiff's employment was terminated, and he received a severance package based on his years of service since his rehire in 1994, instead of 1975. Although the plain-

tiff was paid severance pay when he was initially terminated in 1993, which covered the period from his initial hire until the date that his employment first ended, he nevertheless claimed that he was entitled to receive additional severance pay for the same period for which he was already paid because the defendant's allegedly false representations fraudulently induced him into returning to work. *Ullrich*, 187 F.Supp.2d at 69–71. In arguing against preemption, the plaintiff argued that his claim should not be preempted because "the claim clearly concerns misrepresentations about the terms of Plaintiff's employment, not the Plan or any benefits thereunder." *Id.* at 72. Ruling that ERISA preemption was warranted, however, Judge Seybert characterized the plaintiff's argument as "an effort to circumvent the preemption doctrine" because the fraudulent inducement claim "relates directly to the benefits to which he alleges he is entitled under the Plan." *Id.* at 73.

Preemption is also supported in this case by the persuasive reasoning in two Circuit Court decisions outside the Second Circuit, based on analogous facts. In *Carlo v. Reed Rolled Thread Die Co.*, 49 F.3d 790, 793–95 (1st Cir.1995), the First Circuit held that a former employee's state law claims of negligent misrepresentation based upon the employer's representations concerning the employee's prospective benefits under an early retirement program were preempted by ERISA "because they have a connection with or reference to [the employer's Early Retirement Program (ERP) ]." (citations omitted). As in this case, the plaintiff in *Carlo* allegedly enrolled in an early retirement program in reliance upon an incorrect estimate of expected monthly benefits. The actual monthly benefits were approximately twenty percent less than what the employee expected to receive based upon the employer's earlier representations. *Id.* at

792. In finding that ERISA preempted the state law claims, the court reasoned that if the plaintiff was "successful in [his] suit, the damages would consist in part of the extra pension benefits which [his employer] allegedly promised him[,]" the computation of which "would require the court to refer to the ERP as well as the misrepresentations allegedly made by [the employer]." *Id.* at 794.

Similarly, in *Sanson v. General Motors Corp.*, 966 F.2d 618, 619–23 (11th Cir. 1992), *cert. denied*, 507 U.S. 984, 113 S.Ct. 1578, 123 L.Ed.2d 146 (1993), the Eleventh Circuit found that ERISA preempted a former employee's state law fraud claim based upon the employer's fraudulent misrepresentation of the benefits available under a special retirement program. The plaintiff in *Sanson* alleged that he voluntarily retired pursuant to the standard provisions of the employer's early retirement program in reliance upon the employer's fraudulent representation that it would not offer a special retirement program to assembly plant employees. Shortly after the plaintiff's retirement, however, the employer offered a special retirement program to certain eligible employees, but denied the plaintiff's request to participate in the program. The plaintiff claimed that he would not have retired but for the employer's fraudulent representation, and sought to recover enhanced retirement benefits under the special program, as well as compensatory and punitive damages. *Id.* at 619. Noting that the "existence of a pension plan subject to ERISA is a critical factor" in resolving the plaintiff's state law claim, the court reasoned that "[a]lthough the fraud statute does not involve the existence of a pension plan, the statute would not apply to this case without the existence of the retirement plan." *Id.* at 621. Moreover, since the plaintiff sought retirement benefits

that he would have received under the special retirement program, the court concluded that such a determination of damages demonstrated the integral relationship between the plaintiff's lawsuit and an ERISA plan. *Id.*

Plaintiffs here allege that they elected to participate in Matsushita's Voluntary Resignation Program in reliance upon inaccurate estimates of pension benefits. Regardless of whether they frame their action as one for fraudulent inducement or one seeking supplemental benefits under the plan, the claim is essentially based on the premise that plaintiffs are entitled to the benefits they were promised rather than the benefits provided for in the plan. Indeed, the complaint explicitly seeks compensatory damages calculated according to the difference between the pension benefits received and the benefits they were erroneously promised. (Cmplt.¶ 46). As such, plaintiffs cause of action is indistinguishable from the claims deemed preempted in *Smith, Ullrich, Hamburger, Carlo,* and *Sanson.*

Plaintiffs also argue that their claim does not concern their right to benefits under the plan—an issue which would, of course, be preempted—but instead involves misrepresentations by Matsushita that occurred prior to plaintiff's status as participants in the plan. This distinction is immaterial. The Second Circuit had no trouble finding the plaintiff's common law fraud claims preempted in *Smith,* even though the alleged misrepresentations occurred prior to his enrollment in the pension plan. *Smith,* 959 F.2d at 10–11; *see also Ullrich,* 187 F.Supp.2d at 69–73 (plaintiff's claim of fraudulent inducement preempted by ERISA even though plaintiff was not an employee at the time of the misrepresentations); *Hamburger,* 1998 WL 241214 at *3 (finding plaintiff's common law fraud claim preempted by ERISA

even though the alleged fraud took place before the plaintiff decided to participate in his employer's early retirement plan). Indeed, the majority of federal courts have held that fraudulent inducement claims are preempted because such claims "relate to" the ERISA plan even where the misrepresentations occurred before the plaintiffs enrolled in the plan. *See Varity Corp. v. Howe,* 516 U.S. 489, 505, 116 S.Ct. 1065, 1074, 134 L.Ed.2d 130 (1996) (employer/plan administrator's misrepresentations to employees that their benefits would remain secure if they voluntarily transferred to a separately incorporated subsidiary clearly "related to" an ERISA plan and was preempted); *Hall v. Blue Cross/Blue Shield of Alabama,* 134 F.3d 1063, 1066 (11th Cir.1998) (claims that employee was fraudulently induced to enroll in the insurer's health plan based on material misrepresentations in its marketing regarding scope of coverage for preexisting conditions "relate to" an ERISA plan); *Carlo,* 49 F.3d at 793–5; *Sanson,* 966 F.2d at 619–23.

■ Finally, plaintiffs argue that preemption must be avoided because it would leave them without an adequate remedy for Matsushita's fraudulent inducement. However, plaintiffs have asserted a viable claim under ERISA, so preemption does not leave them without a remedy. In any event, it would be immaterial if ERISA provided no remedy for such conduct. The plain fact is that ERISA's preemptive reach is broader than its remedial provisions. *See Olson v. General Dynamics Corp.,* 960 F.2d 1418, 1423 (9th Cir.1991) ("There is simply no reason to assume that Congress intended ERISA's preemptive reach to be coextensive with the Act's civil remedial scheme."). As the Supreme Court wrote in *Pilot Life:*

> The policy choices reflected in the inclusion of certain remedies and the exclu-

sion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.

*Pilot Life,* 481 U.S. at 54, 107 S.Ct. 1549. The Eleventh Circuit has addressed this precise question in a case closely analogous to the present one:

> The employees protest that to hold that ERISA preempts this fraud claim, while also holding that ERISA does not prohibit the wrong the employees feel they have suffered, leaves a "gap" in the law. That is exactly the result that obtains when Congress determines that federal law should govern a broad area to the exclusion of state regulation and chooses not to prohibit the actions formerly prohibited by state law. It is the very conflict between the federal scheme and state law that is to be avoided through preemption. To argue that Congress has created a "gap" in the law does not undermine the reasoning on which a finding of preemption is based.

*Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1470 (11th Cir.1986), cert. denied, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987).

The Eleventh Circuit's decision is persuasive and entirely consistent with the Second Circuit's guidance on ERISA preemption. Indeed, in *Smith,* the Second Circuit expressly held that the fact that ERISA preemption would leave the plaintiff with no adequate remedy for an alleged misrepresentation and breach of contract by the employer did "not bar the operation of ERISA preemption." *Smith,* 959 F.2d at 11. Since the "carefully integrated civil enforcement provisions" set forth in § 1132(a) of ERISA demonstrated that "Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly[,] ... [t]he policy choices reflected in Congress's inclusion of certain remedies and exclusion of others would be completely undermined if ERISA plan participants and beneficiaries could freely obtain remedies under state law that Congress has rejected." *Id.* (citations omitted); *see also Romney v. Lin,* 94 F.3d 74 (2d Cir.1996) (holding that ERISA preempted the plaintiff's state law claims, even though the plaintiff claimed that such a ruling would leave him with no adequate remedy, because Congress intended to leave benefit plan participants and beneficiaries with *only* the causes of action specifically provided for by ERISA's civil enforcement provisions); *Kishter v. Principal Life Ins. Co.,* 186 F.Supp.2d 438, 447 (S.D.N.Y.2002) ("[t]he fact that plaintiff has no remedy under ERISA, and therefore will have no adequate remedy if his state-law claims are preempted, is immaterial"); *Cromwell v. Equicor-Equitable HCA Corp.,* 944 F.2d 1272, 1276 (6th Cir.1991) ("Nor is it relevant to an analysis of the scope of federal preemption that appellants may be left without remedy").

Accordingly, plaintiffs cannot avoid ERISA's preemption over any potential common law claim for fraudulent misrepresentations by Matsushita concerning the amount of benefits available to them under their employer's voluntary retirement plan. However plaintiffs attempt to characterize this cause of action, the simple fact is that it relies entirely on the existence of an ERISA-regulated pension plan and seeks damages calculated according to its terms.

**6. Plaintiffs Are Not Entitled to a Jury Trial Under ERISA**

■ Matsushita moves to strike the complaint's demand for "a jury trial on all questions of fact." As a matter of law, "there is no right to a jury trial in a suit

brought to recover ERISA benefits." *Sullivan v. LTV Aerospace and Defense Co.,* 82 F.3d 1251, 1257–59 (2d Cir.1996). No jury trial right attaches because "cases involving ERISA benefits are inherently equitable in nature, not contractual." *DeFelice v. American International Life Assurance Co. of New York,* 112 F.3d 61, 64 (2d Cir.1997). This conclusion is inescapable here, as plaintiffs have rested their claims for relief solely on section 1132(a)(3), which provides only for civil actions to enjoin any act or practice that violated the statute or to obtain other appropriate *equitable* relief. *See, e.g., Sullivan,* 82 F.3d at 1258 (noting the distinction between § 1132(a)(1) and finding no jury trial right under § 1132(a)(3) because it provides only for equitable relief); *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 391 (3d Cir.1988) (same); *Resner v. Arc Mills, Inc.,* 1996 WL 554571, *2 (S.D.N.Y. Sept.30, 1996). Even though plaintiffs have requested, and may be awarded money damages, the only funds available to plaintiffs would still constitute equitable relief. *See Resner,* 1996 WL 554571 at *2 (finding that front pay and back pay awarded under § 1132(a)(3) was equitable in nature and plaintiffs were therefore not entitled to a jury trial). Accordingly, even though the complaint survives Matsushita's motion to dismiss, plaintiffs' demand for a jury trial must be stricken.

## CONCLUSION

Defendant's motion to dismiss the complaint pursuant to Rule 12(b)(6) is denied, but the demand for a jury trial is stricken, as are the claims for compensatory and punitive damages. Plaintiffs' request to amend the complaint to include a common law fraud claim is also denied as futile.

**SO ORDERED:**