299 F.Supp.2d 274 (2004)
Nicola and Pietro CAMPANELLA, Individually and on behalf of all others similarly situated, Plaintiffs,
v.
MASON TENDERS' DISTRICT COUNCIL PENSION PLAN, and the Board of Trustees of the Mason Tenders' District Council Pension Plan, Personally and in its capacity as plan administrator, Defendants.
No. 02 Civ.0032 VM.
United States District Court, S.D. New York.
January 21, 2004.
*275 *276 *277 Edgar Pauk, New York, NY, for plaintiff.
Allan M. Marcus, Myron D. Rumeld, Proskauer Rose LLP, New York, NY, for defendants.

DECISION AND ORDER
MARRERO, District Judge.
Plaintiffs Nicola and his brother Pietro Campanella (the "Campanellas") are retired participants in the Mason Tenders' District Council Pension Plan (the "Plan"). The Campanellas bring this action on their own behalf, and on behalf of all other Plan participants, against the Plan and the Board of Trustees of the Plan (the "Trustees" and collectively with the Plan, the "Defendants") pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). They allege numerous violations of ERISA by the Plan and the Trustees. The parties have filed cross-motions for summary judgment. For the reasons discussed below, the Defendants' motion is granted in its entirety and the Campanellas' motion is denied.

I. FACTS AND PROCEEDINGS

Pietro Campanella worked in covered employment under the Plan in 1982 and 1983 and again from 1986 until 1992, when he became unable to work after being injured in a job-related accident. Following his injury, Pietro Campanella applied for and received workers' compensation benefits under the Plan and a Social Security Disability Award. He then applied for a disability pension from the Plan.
The Director of the Mason Tenders' District Council Pension Fund (the "Pension Fund"), Paul Ragone ("Ragone"), denied Pietro Campanella's claim for a disability pension because he determined that Campanella had failed to satisfy the Plan's eight-year vesting requirement. Under the Plan as then in effect, a participant who does not have a vested benefit ceases to be a participant upon a break in service, and forfeits any credit earned for service worked before that break if "the number of consecutive 1-year Breaks in Service equals or exceeds ... [the] years of credit for service earned by the Participant prior to the Break in Service." (Mason Tenders' District Council Pension Fund (the "1989 Plan") § II(1)(A), dated Jan. 1, 1989, attached as Exh. D to Affidavit of John J. Virga dated May 13, 2003 ("Virga Aff.").) Ragone determined that Pietro Campanella had only seven years of credited service because he had worked in covered service from 1986 through 1992 and his two consecutive one-year breaks in service in 1984 *278 and 1985 were longer than the one and one-quarter years of service he worked in 1982 and 1983.
Pietro Campanella appealed this ruling to the Trustees, who denied the appeal in 1994. Pietro Campanella then hired his present counsel, Edgar Pauk ("Pauk"), to represent him in this dispute. Pauk argued to John Virga ("Virga"), who replaced Ragone as Director of the Pension Fund, that under the terms of the Plan, Campanella should receive credit for service based on his receipt of workers' compensation benefits. The Trustees ultimately agreed in 1997 to grant Pietro Campanella service credit for the year 1993 based on his receipt of workers' compensation, and consequently Pietro Campanella qualified for a disability pension based on eight years of service.
Nicola Campanella worked in covered employment under the Plan from 1986 through 1992, when he became unable to work after suffering an injury in a job-related accident. Like his brother, Nicola Campanella applied for and received workers' compensation benefits and a Social Security Disability Award. Nicola Campanella then applied for a disability pension from the Plan. Ragone denied the pension request because Nicola Campanella had only accrued seven years of credited service under the plan between 1986 and 1992. In 1994, the Trustees upheld the denial of Nicola Campanella's claim for a pension.
Nicola Campanella then retained Pauk, who had successfully obtained a disability pension from the fund under virtually identical circumstances for Pietro Campanella. In 1998, the Plan granted Nicola Campanella a disability pension based on eight years of credited service, including one year of workmens' compensation.
Later in 1998, Pauk wrote separate letters to Virga on behalf of Pietro Campanella and Nicola Campanella challenging several aspects of the Plan as being in violation of ERISA, and seeking greater pensions for the Campanellas. Virga failed to respond to the Campanellas' claims. The Campanellas filed an appeal to the Trustees, who denied their claims. Correspondence between Pauk and Virga continued for several years.
In 2002, the Campanellas filed this action on their own behalf and on behalf of all other Plan participants. The Campanellas assert eight claims for relief against the Plan and the Trustees. The first four claims allege statutory violations of ERISA. The Campanellas claim that: the Plan's ranges of accrual of service credit violate ERISA § 204(b)(4)(B), 29 U.S.C. § 1054(b)(4)(B); the Plan's freeze of accrual rates for breaks in service violates ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B); the accrual rate freeze violates ERISA's minimum vesting standards under ERISA §§ 203(a) and 3(19), 29 U.S.C. §§ 1053(a) and 1002(19); and the Plan's policy of not allowing service credit for workers' compensation benefits violates ERISA § 204(b)(4)(A), 29 U.S.C. § 1054(b)(4)(A). In their remaining claims, the Campanellas allege violations of the Plan's terms, seek interest on the delayed payment of benefits, and request penalties against the Trustees.
The Campanellas move for summary judgment on liability, and Defendants cross-move for summary judgment.

II. DISCUSSION

A. STANDARD OF REVIEW

A court may enter summary judgment in favor of a party when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See also, Celotex Corp. v. Catrett, *279 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Sabatino v. Flik Int'l Corp., 286 F.Supp.2d 327 (2003).

B. STATUTE OF LIMITATIONS

Defendants argue that the Campanellas' first four claims are barred under ERISA's statute of limitations for breach of fiduciary duty claims set forth in ERISA § 413, 29 U.S.C. § 1113.[1] Defendants characterize the Campanellas' first four claims as claims for breach of fiduciary duty because, Defendants argue, the claims "challenge the Trustees' actions implementing such provisions." (Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated May 14, 2003 (Def.MSJ), at 4.) Defendants assert that because the provisions of the Plan that the Campanellas challenge in their first four claims had been in effect for more than six years when the Campanellas brought this action, those claims are time-barred under ERISA § 413.[2]
Defendants mischaracterize the Campanella's claims. Claims for breach of fiduciary duty to which the statute of limitations in ERISA § 413 apply typically involve claims for violations of the fiduciary duties enunciated in ERISA § 404, 29 U.S.C. § 1104. Section 404 sets forth a prudent person standard of care to which fiduciaries must adhere in their management of employee benefit plans.[3] The Campanellas' claims here are not brought under ERISA § 404 or any other section in Part Four of Subchapter One of ERISA, which governs fiduciary responsibilities.
The Part under which the claims are brought is significant because the ERISA *280 statute of limitations in § 413 applies only to claims "with respect to a fiduciary's breach of any responsibility, duty or obligation under this part, or with respect to a violation of this part." 29 U.S.C. § 1113 (emphasis added). In Wright v. Southwestern Bell Telephone Co., 925 F.2d 1288, 1290 (10th Cir.1991), the Tenth Circuit held that 29 U.S.C. § 1113 was "only applicable to actions arising out of violations of the portion of [ERISA] addressing fiduciary responsibilities, 29 U.S.C. §§ 1101-12." The Circuit Court noted that the plaintiff's claims did "not involve fiduciary responsibilities regarding financial solvency or accountability as contemplated by [29 U.S.C.] section 1113." Id.; see also, Carollo v. Cement and Concrete Workers District Council Pension Plan, 964 F.Supp. 677, 688 (E.D.N.Y.1997) (holding that statute of limitations in ERISA § 413 applies only to claims for breach of fiduciary duty and distinguishing claims brought pursuant to 29 U.S.C. § 1132(a)(3)).
The "part" referred to in ERISA § 413, 29 U.S.C. § 1113, is Part Four of Subchapter I of ERISA, titled "Fiduciary Responsibility." The Campanellas' first four claims are brought under 29 U.S.C. § 1132 for alleged violations of 29 U.S.C. §§ 1054(b)(4)(B), 1054(b)(1)(B), 1053(a), and 1054(b)(4)(A), which are all located within Part Two of Subchapter I, Participation and Vesting. Section 1132(a)(3) allows any plan participant or beneficiary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter ... or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3) (emphasis added). The Campanellas do not allege that the Trustees mismanaged the Plan's assets or failed to follow the terms of the Plan. Instead, they allege that the Plan itself violates ERISA. The statute of limitations in ERISA § 413, 29 U.S.C. § 1113, does not apply to these claims. See Laurenzano v. Blue Cross and Blue Shield of Massachusetts, Inc. Retirement Income Trust, 134 F.Supp.2d 189, 205 (D.Mass. 2001) (declining to apply 29 U.S.C. § 1113 statute of limitations to ERISA claims brought under 29 U.S.C. § 1132(a)(3) that are not for breach of fiduciary duty).
Because ERISA does not provide a statute of limitations for the type of claims that the Campanellas bring in their first four causes of action, this Court must adopt the most closely analogous New York State statute of limitations. See Miles v. New York State Teamsters Conference Pension and Ret. Fund Employee Pension Benefit Plan, 698 F.2d 593, 598 (2d Cir.1983). The Second Circuit has held that the six-year statute of limitations period under New York Civil Practice Law and Rules ("C.P.L.R.") § 213 applies to claims brought under 29 U.S.C. § 1132. Id.; see also Carollo, 964 F.Supp. at 688-89 (applying statute of limitations in C.P.L.R. § 213 to an action seeking reformation of a benefits plan). Under this rule, "[a] plaintiff's ERISA cause of action accrues, and the six-year limitations period begins to run, `when there has been a repudiation by the fiduciary which is clear and made known to the beneficiaries.'" Id. (emphasis in original) (quoting Valle v. Joint Plumbing Indus. Bd., 623 F.2d 196, 202 n. 10 (2d Cir.1980)). The Court does not need to determine exactly when the statute of limitations began to run for the Campanellas, because statute of limitations is an affirmative defense and therefore the defendant must put forth a prima facie case that it has expired. See Overall v. Estate of Klotz, 52 F.3d 398, 403 (2d Cir. 1995); Katt v. City of New York, 151 F.Supp.2d 313, 348 (S.D.N.Y.2001); Lewis v. Rosenfeld, 138 F.Supp.2d 466, 473 (S.D.N.Y.2001). Here, Defendants have *281 made no effort to establish that the six-year statute of limitations in C.P.L.R. § 213 has expired.

C. EXHAUSTION

Defendants argue that the Campanellas' first cause of action  that the Plan's accrual ranges violate ERISA §§ 204(b)(4)(B) and (C), 29 U.S.C. §§ 1054(b)(4)(B) and (C)  should be dismissed because the Campanellas failed to exhaust their administrative remedies. The Second Circuit requires that a plaintiff bringing an ERISA claim for denial of specific benefits under an employee benefits plan exhaust his or her administrative remedies before pursuing the claim in court. Kennedy v. Empire Blue Cross and Blue, 989 F.2d 588, 594 (2d Cir.1993). But the Second Circuit has not yet addressed whether it requires exhaustion of claims generally alleging statutory ERISA violations. Defendants note that the Seventh and Eleventh Circuits require exhaustion of remedies as regards statutory claims, and urge this Court to follow those decisions. See Robyns v. Reliance Standard Life Ins. Co., 130 F.3d 1231, 1235 (7th Cir.1997); Counts v. American Gen. Life and Accident Ins. Co., 111 F.3d 105, 109 (11th Cir.1997).
But Defendants neglect to indicate that the Third, Fourth, Fifth, Sixth, Ninth and Tenth Circuits have expressly stated that exhaustion is not a prerequisite to actions asserting statute-based ERISA claims. See, e.g., Smith v. Sydnor, 184 F.3d 356, 363-65 (4th Cir.1999); De Pace v. Matsushita Elec. Corp., 257 F.Supp.2d 543, 557 (E.D.N.Y.2003) (collecting cases). Furthermore, several district courts in the Second Circuit have declined to require exhaustion of statute-based ERISA claims. See De Pace, 257 F.Supp.2d at 557; Gray v. Briggs, 1998 WL 386177 at *7 (S.D.N.Y. July 7, 1998). The Court is persuaded by the reasoning of many of these courts, the premise of which is that although plan fiduciaries may have expertise in interpreting the terms of a particular plan, it is primarily the role of the judiciary to engage in statutory interpretation. See De Pace, 257 F.Supp.2d at 557.
Because the Campanellas' claims are not barred by any statute of limitations or exhaustion requirement, the Court now turns to the merits of their claims.[4]

D. THE ACCRUAL RANGES

ERISA § 204(b)(4)(B), 29 U.S.C. § 1054(b)(4)(B), and 29 C.F.R. § 2530.204-2(c) govern the accrual of pension credit for employees who work in covered service on something less than a full-time basis. To comply with ERISA, a plan must provide to an employee who works at least 1000 hours of covered service in a year with at least "a ratable portion of the accrued benefit to which he would be entitled under the plan if his customary employment were full time." 29 U.S.C. § 1054(b)(4)(B); 29 C.F.R. § 2530.204-2(c)(1).
*282 A plan may provide an employee with credit for the exact percentage of a full year based on the hours the employee worked during the year. This method requires an employer to calculate the exact number of hours of credited service that the employee worked during the year and then determine the exact ratable portion of a full year of credited service. Alternatively, a plan may create ranges of service. See 29 C.F.R. § 2530.204-2(c)(4)(ii). Under this system, all employees who work more than 1000 hours in a year but less than a full year fall within one of several bands of hours. Although the employees within the same band may have worked slightly different amounts during the year, all employees within the same band receive the same percentage credit of a full year of service. As long as each band credits employees within that band with at least a ratable portion of the credit that they actually earned during the year, the plan complies with ERISA. For example, if a plan requires 2000 hours for a full year of credit, the plan may give credit for 60 percent of a year to all employees who work between 1001 and 1200 hours in one year. See 29 C.F.R. § 2530.204-2(c)(4)(ii). Because 1200 is 60 percent of 2000, all employees in this band would receive no less than a ratable portion of credit for the hours they had worked during the year.[5]
The Plan at issue uses the range method for calculating credit for partial years of service. Under the Plan, "one unit shall be credited for each 150 hours [of credited service] during any Plan Year. Credit will not be allowed for fractions of a unit nor will an Employee be allowed more than ten units in any Plan Year." (Mason Tenders' District Council Pension Fund, as restated effective January 1, 1989, at 7, attached as Exhibits to the Affidavits of Pietro and Nicola Campanella and the Affirmation of Edgar Pauk in Support of Plaintiffs' Motion for Summary Judgment, dated May 14, 2003, at 189.) Consequently, an employee who works 1500 hours receives credit for a full year of service under the Plan.
The Campanellas argue that the Plan violates ERISA because the Plan's ranges do not provide at least a ratable portion of a full year of credit for partial years of service. They argue that the Plan requires 1500 hours of service for a full year of participation, and therefore it must not require an employee to work more than 1351 hours to receive credit for a full year of service. An employee who works 1350 hours in a year has worked 90 percent of 1500 hours. Thus, the Campanellas assert, any employee who works more than 1350 hours but less than 1500 hours must receive something more than 90 percent credit and must receive no less than a ratable percentage of the hours they have actually worked. But the Plan credits all employees who work between 1351 and 1500 hours with only 90 percent of a year of service. Consequently, the Campanellas argue, the Plan violates ERISA.
The validity of the Campanellas' argument hinges on the number of hours in a full year of participation. If 1500 hours constitutes a full year, then the Campanellas are correct that the Plan's ranges violate ERISA's minimum accrual requirements. But Defendants argue that a full year of participation, based on 35 hours of *283 work per week for 52 weeks, is actually not 1500 hours but 1820 hours, and therefore the Plan's accrual ranges are not only well within ERISA's requirements but in fact generously credit a full year of service to any employee who works more than 82.4 percent of a full year.
The Plan does not expressly define the number of hours required for a full year of participation. ERISA § 204(b)(4)(A), 29 U.S.C. § 1054(b)(4)(A), defines "year of participation" as a "period of service ... determined under regulations prescribed by the Secretary which provide for the calculation of such period on any reasonable and consistent basis." Additionally, ERISA § 204(b)(4)(B), 29 U.S.C. § 1054(b)(4)(B), addresses the accrual of service credit for employees who work less than "full time."
Defendants argue that the collective bargaining agreements (CBAs) between the Mason Tenders' District Council and contributing employers define full-time employment as 35 hours per week for a total of 1820 hours per year, and therefore 1820 hours rather than 1500 hours is the standard for a full year of participation. The introduction to the summary description of the Plan states that "[c]omplete details of the plan are contained in the official plan documents and collective bargaining agreements which legally govern the operation of the plan." (1993 Mason Tenders' District Council Pension Fund Benefits Plan Summary Plan Description, attached as Exhibit G to Virga Aff. at MT 537.)
The Plan could certainly be more precise in defining the number of hours constituting a full year of participation. But it does not follow that because the Plan accords a full year of credit to employees who work 1500 hours, the Plan must therefore accord a full year of credit to employees who work 1351 hours. Absent a definition of "full year," it is entirely reasonable to calculate a full year of participation as a year of full-time employment, which Defendants argue is 1820 hours as defined in the CBAs. As Defendants argue, Pietro Campanella implicitly acknowledged this to be correct in a letter written on his behalf by Pauk to Virga in 1997. Pauk requested that the Plan credit Pietro Campanella with 1820 hours of service per year for every full year for which Campanella received workers' compensation, because 1820 constituted a full year of Campanella's "regularly scheduled working hours." (Letter from Pauk to Virga dated April 23, 1997, attached as Exh. J. to Virga Aff, at MT 45.)
Merely because the Plan allocates a full year of credit to employees who work 1500 hours does not necessarily mean that a full year of employment is 1500 hours. In the example of acceptable plan ranges described in footnote 3, supra, the plan gives a full year of credit to any employee who works at least 1801 hours. But a full year of participation under that plan is not 1801 hours but 2000 hours. Accordingly, the Court concludes that the Plan at issue satisfies ERISA's requirements.

E. MINIMUM ACCRUAL STANDARDS

The Campanellas next argue that the Plan violates ERISA's minimum standards for accrual of pension benefits, commonly known as the anti-backloading provisions, set forth in ERISA § 204(a)(1), 29 U.S.C. § 1054(a)(1).
A plan "backloads" pension benefits when it "provide[s] inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and concentrat[es] the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement." H.R.Rep. No. *284 93807 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4688. Congress inserted anti-backloading provisions into ERISA to prevent a plan "from being unfairly weighted against shorter-term employees." Langman v. Laub, 328 F.3d 68, 71 (2d Cir.2003). The anti-backloading provisions require all defined benefit plans to adopt one of three minimum accrual schedules, commonly called the "three percent schedule," the "133 1/3 percent schedule," and the "fractional schedule," as set forth in ERISA § 204(b)(1)(A), (B), and (C), 29 U.S.C. § 1054(b)(1)(A), (B) and (C).
The Plan at issue follows the 133 1/3 percent schedule. A plan satisfies the 133 1/3 percent schedule for a particular plan year:
if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.
(ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B).)
In other words, the value of the benefit an employee accrues in any one year can not be more than 33 1/3 percent greater than the value of the benefit an employee accrued in any prior year of employment. As noted above, this requirement prevents a plan from weighting the accrual of benefits heavily in favor of long-term employees at the expense of newer and short-term employees. But because the standard would also prevent a plan from ever increasing benefits for all employees by more than one-third of the value of the original benefits, the 133 1/3 percent schedule provides that "any amendment to the plan which is in effect for the current year shall be treated as in effect for all other plan years" and also that "any change in an accrual rate which does not apply to any individual who is or could be a participant in the current year shall be disregarded." ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B).
Consequently, a plan can enact an across-the-board prospective increase in benefit rates for all employees that takes effect the following year. For example, a plan could not provide a one percent accrual rate to all employees in their first ten years of service and a two percent accrual rate to all employees with more than ten years of service, because the benefit accrued by employees with more than ten years of service would be more than one-third greater than the benefit accrued by employees with ten or fewer years of employment. But if a plan provides that all employees accrue benefits at a rate of one percent per year, the plan can validly increase the accrual rate for all employees to two percent, as long as that increase applies only prospectively to future years.
The Campanellas argue that the Plan violates the 133 1/3 percent test because the Plan applies rate increases only to an employee's current period of continuous service. Whenever the Plan increases the benefit rate, employees with continuous service receive the higher benefit rate for all of their years of service. Employees with a break in service, however, receive the increased benefit rate only for the continuous period of service since their last break in service, and receive the lower benefit rate (i.e., the last rate in effect at the time of their break in service) for their pre-break service. This rule creates the possibility that there will be some employees for whom the value of the benefit they *285 accrue in some years will be more than 33 1/3 percent greater than the value of the benefit they accrued in other years. If an employee worked for many years under the Plan at a relatively low benefit rate, experienced a break in service, and then resumed employment for a short time when the benefit rate was substantially higher, that employee could conceivably accrue a disproportionately high rate of his total benefits late in his years of service.[6]
The Second Circuit recently examined a benefit plan similar to the Plan in this case. In Langman v. Laub, 328 F.3d 68, 71 (2d Cir.2003), the Circuit Court rejected a claim that applying a benefit rate increase only to an employee's current period of continuous service violates the 133 1/3 percent test. The Circuit Court ruled that the 133 1/3 percent test "is irrelevant to across-the-board increases in benefit rates made at some future time on behalf of all current employees regardless of period of service. Indeed, it would be a strange rule that would prohibit a fund from making more than a one-third increase in its across-the-board benefit rate unless that rule were retroactively applied to all former employees[.]" Id. at 71-72.
Since Langman, two district courts in this Circuit have followed Langman and rejected backloading challenges to similar freeze provisions that lock in a benefit rate upon a break in service and apply an increased benefit rate only to an employee's most recent period of continuous service. See Melvin v. UA Local 13 Pension Plan, No. 98 Civ. 6347, 2003 WL 22384789 (W.D.N.Y. Sept. 26, 2003); King v. Pension Trust Fund of Pension, Hospitalization and Benefit Plan of Elec. Indus., No. 01 Civ. 2604, 2003 WL 22071612 (E.D.N.Y. Sept. 5, 2003). The Court finds these precedents germane and persuasive and, consistent with Langman, dispositive of the issues here in dispute. For these reasons, the Court rejects the Campanella's backloading claim. All current employees under the Plan are accruing the same benefit rate for their current and future uninterrupted service. That is the goal of ERISA's antibackloading provisions.

F. MINIMUM VESTING STANDARDS

ERISA § 203(a), 29 U.S.C. § 1053(a), provides that an accrued benefit is "nonforfeitable" once it has vested. The Supreme Court has called the nonforfeitability provision "critical to the ERISA scheme" because it ensures that employees will receive upon retirement the pension benefits that they were promised during their employment. Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 510, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981). ERISA defines "nonforfeitable" as "a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." ERISA § 3(19), 29 U.S.C. § 1002(19).
*286 The Campanellas assert that the Plan violates ERISA's minimum vesting standards. They argue that the Plan contains an impermissible restriction in that receipt by an employee upon retirement of the current benefit rate for all of the employee's years of service is conditioned on the employee not experiencing a break in service.[7]
The Plan provides that every time the benefit rate increases, that increase will be applied prospectively and to all of an employee's most recent period of continuous service. The Campanellas claim that this provision wrongly conditions an employee's accrued benefit on future continuous service.
But, as the Court reads the provision at issue, the Plan does no such thing. The Plan does not make any employee's accrued benefits forfeitable. The Plan makes future increases in benefits forfeitable. But the possibility of not receiving an increase in benefits is quite different from the possibility of losing benefits that have already been accrued. ERISA prohibits only the latter. The Plan gives employees upon retirement at least the full value of benefits they were promised when they earned them.

G. ACCRUAL FOR WORKERS' COMPENSATION

A participant in the Plan qualifies for a normal pension when he reaches the "Normal Retirement Date"  which the Plan defines as the employee's 65th birthday or, if later, the fifth anniversary of when the employee became a participant in the Plan  and has at least ten years of credited service. A participant qualifies for an early pension benefit on or after turning age 55 if the participant has at least 12 years of service.
The Plan also provides a disability pension benefit to any employee who becomes disabled before reaching age 65, receives Social Security Disability Income, and who has at least eight years of vested service credit. The amount of the disability pension is set at the normal pension the employee would have received based on the amount of service credit accrued as of the date of the disability retirement.
ERISA § 204(b)(4)(A), 29 U.S.C. § 1054(b)(4)(A), provides that "[f]or purposes of determining an employee's accrued benefit, the term `year of participation' means a period of service ... as determined under regulations prescribed by the Secretary which provide for the calculation of such period on any reasonable and consistent basis."
The Campanellas argue that the Plan violates this provision because the Plan's normal pension and early retirement pension do not give accrual credit for years during which an employee is receiving a disability pension. For example, Nicola Campanella retired with a disability pension in 1993 based on eight years of credited service. He asserts that when he reaches age 55 in 2007, he should be eligible to switch from a disability pension to the more valuable early retirement pension based on 22 years of service (the eight years of service he accrued while working and the 14 years of service he claims he will have accrued while receiving a disability pension).
*287 To support their argument that Plan participants accrue credit towards an early or full pension while they are receiving a disability pension, the Campanellas rely on the Plan's definition of "hour of service:"
`Hour of Service' or `Hours Worked' means each hour for which the Employee is directly or indirectly compensated or is entitled to be compensated by the Contributing Employers for the performance of duties for the Contributing Employer, each hour for which an Employee is paid or entitled to payment by the Contributing Employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence[.]
(Plan § I(14).)
Understandably, the Campanellas emphasize the portion of the above definition which requires the Plan to credit participants for "incapacity (including disability)." But the Plan's definition of "hour of service" carefully distinguishes between hours credited based on performance of duties and hours credited when no duties are performed. The Plan gives credit for the performance of duties regardless of whether the employee is "directly or indirectly compensated by the Contributing Employer." But the Plan gives credit for hours in which no duties are performed only if the participant is "paid or entitled to payment by the Contributing Employer." Thus, the Plan distinguishes payment directly from an employer to a participant and payment made indirectly to a participant by someone other than the employer.
During the time that they received their disability pensions, the Campanellas received workers' compensation. Worker's compensation is paid to a disabled employee by an insurer; it is not paid directly to the employee by the employer. The Plan allows credit to be earned for hours for which an employee is indirectly paid by his or her employer only when that payment is compensation for the performance of duties. When an employee is receiving a disability pension, that employee is by definition not performing duties. The reference to incapacity and disability in the Plan's definition of "hour of service" falls within that portion of the definition that discusses time for which the employee is paid by the contributing employer, as distinguished from time for which the employee is paid "directly or indirectly" by the contributing employer. Id. Consequently, hours for which an employee receives workers' compensation from an insurer due to a disability do not count towards that employee's pension credits.
In further support of this interpretation, the Court considers the section of the Code of Federal Regulations promulgated by the federal Department of Labor discussing hours of service for purposes of pension credits, 29 C.F.R. § 2530.200b-2. As the Campanellas note, under this section "a payment shall be deemed to be made by or due from an employer regardless of whether such payment is made by or due from the employer directly, or indirectly through, among others, a trust fund, or insurer, to which the employer contributes or pays premiums[.]" 29 C.F.R. § 2530.200b-2(a)(2). But more importantly, as Defendants note, the same section also states that "[a]n hour for which an employee is directly or indirectly paid, or entitled to payment, on account of a period during which no duties are performed is not required to be credited to the employee if such payment is made or due under a plan maintained solely for the purpose of complying with applicable workmens' compensation *288 ... laws[.]" 29 C.F.R. § 2530.200b-2(a)(2)(ii).
Neither the Plan nor the Department of Labor envisioned awarding employees pension credits for time during which they were receiving a disability pension. This ruling resolves the Campanellas' fourth and sixth causes of action, both of which involved credit for time during which a participant is receiving workers' compensation.

H. SERVICE OF PIETRO CAMPANELLA IN 1982-1983

Pietro Campanella worked in covered service in 1982 and part of 1983, experienced a break in service in 1984 and 1985, and resumed working in covered service from 1986 until he became disabled in 1992. When the Plan granted Pietro Campanella a pension, it did not give him credit for the time he worked in 1982 and 1983. The Trustees made this decision by applying the break in service rules from the version of the Plan that they contend applies to breaks in service in 1984 and 1985  the 1982 Plan. The Campanellas argue that the 1989 Plan, which was in effect when Pietro Campanella became disabled, or the 1993 Plan, which was in effect when he applied for a disability pension, should apply. The 1989 and 1993 Plans contain an amendment to the break in service rules that is more favorable to Pietro Campanella than the 1982 Plan.
The dispute over the applicable plan hinges on language in the Introduction to the 1989 Plan, which states:
The rights, obligations and pension amounts of Participants who have retired, died or terminated employment prior to January 1, 1989 shall be determined under the Plan as it existed on the date of retirement, termination or death and shall not be changed by virtue of this restatement unless specifically provided for herein. The Plan as restated applies to Employees with an Hour of Service on or after 1989 or such later date as may be provided for herein.
(1989 Plan at Introduction, MT 300.)
Defendants determined that Pietro Campanella's break in service in 1984 and 1985 constituted a "termination" of his employment prior to January 1, 1989, and therefore they applied the rules of the Plan as it existed in 1984 and 1985 (i.e., the 1982 Plan) to evaluate Campanella's claim of credit for his work before his break in service. Under the 1982 Plan, Pietro Campanella could not receive credit for the 1.25 years of service he accrued in 1982 and 1983 before his two-year break in service in 1984 and 1985.
Pietro Campanella argues that his break in service in 1984 and 1985 was not a "termination" of employment, and that because he has an hour of service or more after 1989, the terms of the 1989 or 1993 Plan should apply to all of his years of service.

1. Standard of Review

The first question to resolve is the proper standard of review for the Court to apply to the Trustees' interpretation of the language in the 1989 Plan. Typically, if a benefits plan "gives the administrator ... discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a court will defer to the administrator's decision to deny benefits unless the decision was arbitrary and capricious. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995).
The Campanellas argue that no deference is due to the Trustees' decision to deny Pietro Campanella credit for his service *289 in 1982 and 1983 because the Trustees issued their final decision on appeal after the expiration of the Plan's time limit for resolution of appeals. Under the terms of the Plan, any appeal not decided by the Trustees within 60 days of being filed (or 120 days if circumstances warrant an extension of time) is deemed denied by the Trustees.
On October 5, 1998, Pietro Campanella filed his appeal to the Trustees of the denial of his claim for credit for his prebreak service. On November 25, 1998, Virga informed Pauk that the appeal was referred to the legal counsel for the Plan but did not request additional time to decide the appeal. As of March 26, 1999, the Trustees had not yet ruled on the appeal, and Pauk sent the Trustees a letter reminding them of the pending appeal and asking them to indicate whether they intended to decide or ignore the appeal. On April 1, 1999, Virga informed Pauk that the Trustees would be responding to the appeal within one week, and on April 15, 1999, the Trustees issued a written decision denying the appeal.
The Campanellas argue that because the Trustees ultimately issued their decision long after the expiration of the 60-day time limit, that decision should receive no deference from the Court. The Campanellas rely on several recent decisions to support their argument. In Gilbertson v. Allied Signal, Inc., 328 F.3d 625 (10th Cir. 2003), the administrator of a benefit plan did not rule on a participant's appeal of a denial of benefits within the plan's time limits, and thus the appeal was deemed denied by the administrator. The Tenth Circuit applied de novo review to the participant's claim for benefits. The Court held that "to be entitled to deferential review, not only must the administrator be given discretion by the plan, but the administrator's decision in a given case must be a valid exercise of that discretion." Id. at 631. The Court determined that when a plan places time limits on the administrator's exercise of discretion and the administrator substantially fails to act within those time limits, the resulting deemed denial of an appeal is not an exercise of discretion and not worthy of deference by a court. Id. at 631-32.
In Gilbertson the plan administrator never issued a decision on the appeal. However, in Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan, 349 F.3d 1098 (9th Cir.2003), the plan administrator issued a final decision on appeal, but it did so after the plan's deadline for deciding an appeal expired and therefore the appeal had already been deemed denied under the plan. Moreover, the participant had filed a complaint in federal court after the time limit expired and before the administrator issued the decision. The Ninth Circuit ruled that once the time limit for deciding the appeal expired, the appeal was deemed denied and that denial was not an exercise of discretion. Id. at 1104-1106. The Ninth Circuit gave no deference to the written decision of the administrator issued after the participant's appeal had already been deemed denied. The court stated that "[d]eference to an exercise of discretion required discretion actually to have been exercised." Id. at 1105.
Other courts have accorded deference to an administrator's denial of an appeal for benefits issued after the deadline for responding to the appeal expired, see DiCamillo v. Liberty Life Assurance Co., 287 F.Supp.2d 616, 625 (D.Md.2003); see also, Jebian, 349 F.3d at 1111-16 (Tashima, J., dissenting), and to a simple "deemed denial" based on a complete failure to respond to an appeal. See McGarrah v. Hartford Life Ins. Co., 234 F.3d 1026, 1031 (8th Cir.2000); Wertheim v. Hartford Life Ins. *290 Co., 268 F.Supp.2d 643, 664 (E.D.Va.2003). In McGarrah, the Eighth Circuit held that the "mere presence of a procedural irregularity is not enough to strip a plan administrator of the deferential standard of review" and that for a court to apply de novo review, a "claimant must also present evidence that the irregularity raises `serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" 234 F.3d at 1031 (quoting Buttram v. Central States, S.E. & S.W. Areas Health & Welfare Fund, 76 F.3d 896, 900 (8th Cir. 1996)). Similarly, the court in DiCamillo determined that the administrator's delay in issuing a decision on a participant's appeal did not prejudice the participant and substantially complied with the time limit, and that the administrator's issuance of a reasoned decision, albeit after the appeal was already deemed denied, was an exercise of discretion worthy of deference from a court. DiCamillo, 287 F.Supp.2d at 626-27.
The Plan at issue here requires the Trustees to respond to an appeal within sixty days, unless an additional sixty days are needed. If the Trustees fail to respond, the appeal will be deemed denied. As a general matter, this "deemed denial" enables a participant to file an action in court and establish that he or she has exhausted all administrative remedies. In many instances, a plan's trustees may be able to quickly determine that an appeal has no merit but may not be willing to devote their time and energies to preparing a full explanation of their reasoning in a written decision. Furthermore, a requirement that trustees receive deference on their decisions only if they act on appeals within a time limit may force them to meet on an almost continuous basis solely to decide voluminous amounts of appeals, to the exclusion of other matters related to the administration of a benefit plan.
In the case at bar, the Trustees did not decide Pietro Campanella's appeal within the deadline, but they did decide his appeal and  at Campanella's request  they issued a written decision explaining their reasoning before the commencement of this litigation. The Trustees should not now be penalized for going beyond their duties and issuing a written explanation of their decision when none was required. The Court will therefore not review de novo the decision of the Trustees denying the Campanellas' claims and will defer to that determination unless the denial is arbitrary and capricious.

2. Credit for Pre-Break Service

The Trustees denied Pietro Campanella credit towards his pension for the 1.25 years that he worked in 1982 and 1982 before his two-year break in service in 1984 and 1985. Under the arbitrary and capricious standard, the Court may overturn this decision only if it was made "without reason, unsupported by substantial evidence or erroneous as a matter of law." Scannell v. Metropolitan Life Ins. Co., 2003 WL 22722954 at *4 (S.D.N.Y. Nov.18, 2003) (quoting Pulvers v. First UNUM Life Ins. Co., 210 F.3d 89, 92 (2d Cir.2000)). The arbitrary and capricious standard mandates that "[w]here both the plan administrator and a spurned claimant `offer rational, though conflicting, interpretations of plan provisions, the [administrator's] interpretation must be allowed to control.'" Pulvers, 210 F.3d at 92-93 (quoting O'Shea v. First Manhattan Co. Thrift Plan & Trust, 55 F.3d 109, 112 (2d Cir.1995)).
The Trustees denied Pietro Campanella's claim for credit for his service in 1982 and 1983 based on an interpretation of language in the introduction to the 1989 Plan quoted above. See supra, section *291 H.1. In their written decision, the Trustees stated that "since Mr. Campanella did in fact terminate employment prior to January 1, 1989, the Plan's break in service rule as it existed at the time of such termination applied to that period, notwithstanding that he later became a participant again when he returned to work the requisite number of hours in covered employment. This interpretation is applied consistently with respect to all Fund participants." (Letter dated April 15, 1999 from Virga to Pauk, attached as P. 173 to Exhibits to the Affidavits of Pietro and Nicola Campanella, and the Affirmation of Edgar Pauk in Support of Plaintiffs' Motion for Summary Judgment.)
The Court finds the Trustees' interpretation of the language in the Introduction to the 1989 Plan to be entirely reasonable. While the Campanellas' interpretation may also be reasonable, that assessment alone cannot form the basis for a court overturning a trustees' decision under the arbitrary and capricious standard of review. There is no indication here that the Trustees have not consistently interpreted this provision in the same manner as they did in their resolution of Pietro Campanella's appeal. Accordingly, the decision was not arbitrary and capricious.

I. INTEREST ON DELAYED BENEFITS

In 1997 and 1998, the Plan granted Pietro and Nicola Campanella disability pensions based on eight years of service. The pensions were retroactive to 1993, when the Campanellas received their Social Security Disability Awards, but the pensions did not include interest on the retroactive amounts. The Campanellas now seek interest on their retroactive pensions.
The Plan provides for the retroactive payment of a disability pension but makes no provision for the payment of interest on a retroactive award. The Campanellas argue that interest on retroactive benefits is a form of equitable relief to which they are entitled under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). The Campanellas argue that by ultimately granting them disability pensions after initially denying their requests, the Trustees necessarily acknowledged that the initial denial of benefits was made in violation of the Plan. The Campanellas argue that the Plan should not be able to profit from its wrongdoing by not paying interest on funds that it wrongly retained for several years.
The Campanellas rely on Dunnigan v. Metropolitan Life Insurance Co., 277 F.3d 223 (2d Cir.2002), to support their claim that the Plan must pay interest on retroactive awards of benefits. In Dunnigan the Second Circuit did hold that interest on retroactive benefit awards could be recovered as a form of equitable relief under ERISA § 503(a)(3), but the Court went on to state that interest should only be awarded if the delay in granting benefits was unreasonable or unjustified. Id. at 230.
In the case at bar, the Plan initially denied Pietro Campanella's claim for a disability pension in July 1994 and denied Nicola Campanella's claim in June 1994. Pietro Campanella did not contact the Plan again about a disability pension until May 1996, when an exchange of correspondence began that continued for the remainder of the year. In April 1997, the Trustees granted Pietro Campanella a disability pension subject to Campanella producing certain documentation. Correspondence continued for several months, and the Plan ultimately issued Pietro Campanella a check on September 1, 1997 covering Campanella's disability pension payments retroactive to January 1993. A relatively similar sequence of events occurred as to *292 Nicola Campanella, who waited three years after his initial request for a disability pension was denied to contact the Plan again.
Thus, the multi-year delays by the Campanellas between the initial denial of their claims for benefits and the re-initiation of their claims was a primary contributing factor to the length of time that elapsed before the Campanellas ultimately received their disability pensions. That the Trustees altered their determination and decided to grant both claimants disability pensions does not necessarily mean that the Trustees' initial denial of the Campanellas' claims violated the Plan.[8] There is nothing to indicate that the lengths of time between the Campanellas' initial claims for benefits and the Trustees' ultimate approval of those claims several years later were unjustified.
Moreover, the Supreme Court's decision in Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), in which the Court sharply narrowed the scope of equitable relief available under ERISA Section 502(a)(3), casts serious doubt on Dunnigan's broader characterization of interest on retroactive awards of benefits as a permissible form of equitable relief. See Flint v. ABB, Inc., 337 F.3d 1326, 1331 (11th Cir.2003) (noting that Great-West "raises the question whether 502(a)(3) ever allows an award of interest for delayed benefits or whether such a claim is an impermissible attempt to dress an essentially legal claim in the language of equity"); Dobson v. Hartford Financial Services, 196 F.Supp.2d 152, 170 (D.Conn. 2002). The Campanellas' claim for interest on the retroactive award of benefits is denied.

J. PENALTIES

The Campanellas' final claim is for penalties against the Trustees for failure to produce certain plan documents upon request.
ERISA § 104(b)(1), 29 U.S.C. § 1024(b)(1), requires a plan administrator to provide every participant with an updated summary plan description ("SPD") every five years unless no amendments have been made to the plan during that time. As of February 2003, the most current SPD for the Plan was issued in 1993. The Plan has been amended since 1993 but no new SPDs were issued.
ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1), provides a penalty for failure to comply with ERISA § 104(b)(1). Under this section:
any administrator ... who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.
(29 U.S.C. § 1132(c)(1).)
On June 10, 1999 and December 31, 2001, the Campanellas submitted written requests to Virga for all SPDs issued during the period that the Campanellas were participants in the Plan, and in the latter *293 correspondence they also requested the SPD currently in effect. Virga responded on January 15, 2002 that the 1993 SPD was still the SPD currently in effect.
An award of penalties and the amount of those penalties depend on five factors: "(1) the administrator's bad faith or intentional conduct; (2) the length of the delay; (3) the number of requests made; (4) the extent and importance of the documents withheld; and (5) the existence of any prejudice to the participant or beneficiary." McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund, 320 F.3d 151, 163 (2d Cir.2003) (quoting Austin v. Ford, No. 95 Civ. 3730, 1998 WL 88744, at *6 (S.D.N.Y. Mar.2, 1998)).
The Campanellas make no allegations of bad faith on the part of the Trustees in failing to enact a new SPD, nor are there any allegations of bad faith on the part of Virga in withholding the current SPD. Although the length of the delay since the Campanellas made their initial request is substantial, the Campanellas only made two requests for the documents  requests separated by an interval of two and one half years. Moreover, Virga promptly furnished the Campanellas with the current SPD. There is no indication that a more current SPD, which conceivably would have been enacted after the Campanellas had already retired, would have impacted the resolution of any of the Campanellas' claims. The Campanellas have made no effort whatsoever to demonstrate that they were prejudiced by the Plan's failure to enact a more current SPD. Accordingly, the Campanellas' claim for penalties is denied.

III. ORDER

For the reasons discussed above, it is hereby
ORDERED that the motion of plaintiffs Nicola and Pietro Campanella for summary judgment on liability is denied and the motion of defendants Mason Tenders' District Council Pension Plan and The Board of Trustees of the Mason Tenders' District Council Pension Plan is granted.
The Clerk of Court is directed to close this case.
SO ORDERED
NOTES
[1] ERISA § 413 provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty or obligation under this part, or with respect to a violation of this part, after the earlier of-(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.
29 U.S.C. § 1113.
[2] This argument was rejected in DeVito v. Pension Plan of Local 819 I.B.T. Pension Fund, 975 F.Supp. 258, 265 n. 9 (S.D.N.Y. 1997). In DeVito, the court noted that if the statute of limitations for challenging a provision of a plan began to run when that provision was enacted, this would lead to an "unacceptable scenario" in which "any beneficiary who commences employment more than six years after the date of a challenged amendment would automatically be precluded from asserting a Section 1132 ERISA claim." Id.
[3] ERISA § 404 provides in pertinent part:

(a) Prudent man standard of care
(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and 
(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.
29 U.S.C. § 1104.
[4] Defendants also argue that the Campanellas lack standing to assert several of their claims because they have not suffered any injury and have no legally cognizable interest in the outcome of those claims. But ERISA § 502(a), 29 U.S.C. § 1132(a), provides that "a civil action may be brought (3) by a participant, beneficiary or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan." ERISA does not demand the particularized level of injury that the Defendants ask the Court to require of the Campanellas. The Campanellas are participants in the Plan and they allege that the Plan violates certain provisions of ERISA. They can proceed with their claims. See Fin. Inst. Ret. Fund v. Office of Thrift Supervision, 964 F.2d 142 (2d Cir. 1992). The Court notes that the parties' cross-motions for summary judgment do not require any decision on class certification.
[5] The remaining accrual ranges in this example would be as follows:

Hours Worked Percentage Credit
1201-1400 70
1401-1600 80
1601-1800 90
1801 and above 100

Thus, in this example any employee who worked at least 1801 hours of covered service in a year would receive credit for a full year of service. See 29 C.F.R. § 2530.204-2(c)(4)(ii).
[6] As an example, the Campanellas describe a hypothetical employee benefit plan which increased its benefit rate in 1996 from $20 per year of service to $50 per year of service for the last period of continuous service. If an employee who retired on January 1, 2003 worked 25 years of covered service with a one-year break in service in 1995, that employee would receive a total pension of $710 per month. In the eighteen years of service from 1977-1994 the employee would accrue $360 towards his monthly pension (18 years × $20 per year of service, the rate in effect in 1994), and in the seven years of service from 1996-2002, the employee would accrue $350 towards his monthly pension (7 years × $50 per year of continuous service, the rate in effect in 2003). Thus, the employee would have accrued 49 percent of his pension in just the last seven of his 25 years of service.
[7] Section II(2) of the 1989 Plan provides in part:

If a Participant, without a vested benefit, ceases to be a Participant and again becomes a Participant ... the amount of pension which he may subsequently become entitled for the years of prior credited service shall be based on the rate of monthly pension in effect on the date of the termination of participation in the Plan.
[8] Defendants claim that the decision to grant the Campanellas disability pensions under the circumstances was made in hopes of avoiding costly litigation.